**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

AARON DEMARCO FOSTER, a/k/a Turk,
a/k/a Ace, a/k/a Little Aaron,
*Defendant-Appellant.*

No. 04-4618

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

KEON MOSES, a/k/a Black,
*Defendant-Appellant.*

No. 04-4619

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MICHAEL LAFAYETTE TAYLOR, a/k/a
Mike Mumbles,
*Defendant-Appellant.*

No. 04-4620

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(CR-02-410-CCB)

Argued: September 26, 2007

Decided: November 13, 2007

Before WILKINSON, Circuit Judge,
HAMILTON, Senior Circuit Judge, and
T. S. ELLIS, III, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion. Senior Judge Hamilton wrote the opinion, in which Judge Wilkinson and Senior Judge Ellis joined.

---

## COUNSEL

**ARGUED:** Robert Whelen Biddle, NATHANS & BIDDLE, L.L.P., Baltimore, Maryland; Arcangelo Michael Tuminelli, Baltimore, Maryland, for Appellants. Stephanie Agli Gallagher, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Robert H. Waldman, Annapolis, Maryland, for Appellant Michael Lafayette Taylor; Teresa Whalen, Silver Spring, Maryland, William B. Purpura, Baltimore, Maryland, for Appellant Aaron Demarco Foster. Rod J. Rosenstein, United States Attorney, Andrea L. Smith, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

## OPINION

HAMILTON, Senior Circuit Judge:

These are the consolidated appeals of three defendants, Keon Moses, Michael Taylor, and Aaron Foster, who were tried, convicted, and sentenced for conspiracy to possess with the intent to distribute and to distribute fifty grams or more of cocaine base (crack), 21 U.S.C. § 846, and for various related substantive offenses. For the reasons stated below, we affirm the district court's judgments.

# I

## A

This case concerns a drug conspiracy taking place within an approximately six-square block neighborhood in West Baltimore, Maryland known as "Lexington Terrace." (J.A. 329). According to the government's evidence produced at trial, between 1999 and late 2002, rampant drug dealing took place in Lexington Terrace and numerous acts of violence were performed in the neighborhood to protect this drug dealing activity.

Put succinctly, the Lexington Terrace neighborhood was an open-air drug market in which substantial quantities of crack were sold on a daily basis during the charged time frame. All of the dealers in the neighborhood had grown up in Lexington Terrace or worked with a person who had grown up there. Some dealers belonged to a particular drug distribution gang within the neighborhood, while others did not. Moreover, dealers often bore tattoos, which recognized their relationship to the neighborhood.

In some respects, Lexington Terrace dealers worked independent of other dealers. For example, different dealers often had different sources of supply. Some dealers sold their drugs in a distinctive color-top vial, which allowed users to associate the color-top of the vial with the quality of the product. Moreover, dealers competed with other dealers for business; thus, when a vehicle approached with somebody looking for drugs, multiple dealers, perhaps from multiple gangs, approached the vehicle trying to consummate a sale.

In other respects, the Lexington Terrace drug dealers worked in consort with each other. They shared stash houses and firearms. They respected a user's selection of a particular dealer, which allowed numerous dealers to operate in the area, even dealers not associated with a gang. A dealer's decision to leave a drug dealing gang generally was respected, and the departing dealer enjoyed the freedom to deal drugs on his own. Neighborhood dealers also made change for each other on occasion. For their mutual aid and protection, Lexington Terrace dealers alerted each other to the presence of law enforcement authorities and jointly controlled the area, through the use of

intimidation and violence, to the exclusion of others. Dealers who experienced legal troubles often received financial assistance from other neighborhood dealers. For example, a dealer's legal expenses might be paid by another dealer or a dealer incarcerated might receive some money to spend in prison. Dealers returning to the neighborhood from a prison stint often received drugs on the front to sell from other dealers, which allowed the newly-released dealer to reestablish himself financially.

This peaceful coexistence between the neighborhood dealers worked to the benefit of both users and the neighborhood dealers. Users enjoyed the regular availability of drugs in the neighborhood, while the dealers were able to thrive financially with steady business and little violence amongst themselves.

It was within this environment that Moses, Taylor, and Foster sold substantial quantities of crack. Foster was from the Lexington Terrace neighborhood and had a "Terrace Life" tattoo on his right forearm. (J.A. 453). Several witnesses testified that they had purchased crack from Foster. Moreover, Aaron Butler, a neighborhood dealer, testified that, in 1999, Foster was selling grey-top vials of crack and was using Monique Andrews's house as his stashhouse. Butler further testified that, in 2000, he and Foster were selling crack together. Another witness testified that Foster was at times in charge of supervising his gang's drug activity. Foster was incarcerated in July 2000, and, upon his release in October 2001, he returned to Lexington Terrace and began dealing crack again.

Moses also grew up in the Lexington Terrace neighborhood. Butler testified that, in 1999, Moses was selling crack with Brandon Allison, using, like Foster, Monique Andrews's house as a stashhouse. Moses was arrested at that house on June 15, 1999, with the keys to the house in his pocket.

Following a period of incarceration, Moses was released in August 2001 and immediately began selling purple-top vials of crack with Taylor. Moses was stopped in his vehicle by a law enforcement officer in September 2001 and had 300 empty purple-top vials in his car. Greg Spain was fronting narcotics to Moses in August/September 2001 because Moses had just been released from prison.

Although he was eventually incarcerated on state charges of committing a double murder, Moses remained a participating member of the conspiracy. From jail, he wrote a letter to Taylor instructing Taylor to kill one of the witnesses ready to testify against him.

Taylor grew up in the Lexington Terrace neighborhood and had Lexington Terrace tattoos. In mid to late 2001, Taylor was selling purple-top vials of crack with Moses. Taylor also gave money to Moses while Moses was on the run after the double homicide. At various times, Taylor sold crack and shared stashhouses with other Lexington Terrace dealers.

In January 2002, after he turned eighteen-years old, Taylor's participation in the drug conspiracy began to escalate.[1] He began dealing with Brandon Allison, another Lexington Terrace dealer. That same month, Taylor was arrested in two house raids at a stashhouse owned by Pamela Mack and shared by Lexington Terrace dealers. In one of the raids, Taylor's fingerprint was found on a gun recovered at the residence. Taylor later admitted to law enforcement authorities that he was a drug dealer in the Lexington Terrace neighborhood.

In addition to each defendants' extensive drug dealing activities, the government's case focused on related crimes of violence. The first of these occurred on September 23, 2001 at 303 North Calhoun Street in Baltimore, in the basement of a row house owned by Charles Brockington III's grandmother. On that day, Moses and Taylor, accompanied by Marcus Baskerville,[2] killed Gregory Spain and Ronald Harris, and attempted to kill Brockington.

Spain, Harris, and Brockington were a group of drug dealers in a neighborhood close to Lexington Terrace. Moses had been supplied by Spain since Moses's release from prison in August 2001. Moses and Spain eventually had a falling out, so Moses decided to steal Spain's stash, with the help of Taylor and Baskerville.

---

[1]Taylor turned eighteen-years old on December 31, 2001.

[2]Baskerville was indicted along with the other defendants, but his case was severed and tried separately.

Moses, Taylor, and Baskerville donned masks, bandanas, and caps, and went to Brockington's on the day in question, where they found Brockington in bed. Brockington lived in the basement of his grandmother's house, and the front door was usually unlocked. Spain, Harris, Robert "Snoop" McManus, and Samuel Wilder usually came around every day, woke Brockington, and played video games and hung out. On the day of the murders, Brockington heard what he believed were his friends entering the house and coming downstairs. He awoke to three armed, masked men surrounding his bed. The assailants demanded drugs, money, and firearms, and kept asking for Spain.

Spain eventually arrived as expected, could not get in, and started shouting at the front door. Moses and Taylor took Brockington upstairs to open the door. Brockington tried to tell Spain with his eyes that there was a problem, but Moses grabbed Spain and pulled him inside. All four went back downstairs, leaving the door unlocked. Harris then showed up at the house and walked right into the scene in the basement.

Thereafter, Moses took Brockington outside to a waiting vehicle and drove him to the location where the drugs were supposedly located. Taylor and Baskerville were left guarding Harris and Spain. When Moses learned that no drugs were accessible at the other location, Moses brought Brockington back to the house on North Calhoun Street. Moses yelled for someone to open the door, and Taylor, leaving Baskerville with Spain and Harris, went to answer the door.

Brockington recalled Taylor opening the door and then hearing the sound of a single shot coming from the basement just as they got inside the front door. Taylor had his firearm in one hand and pulled Brockington down the basement steps, by his shirt, with the other hand.

Brockington watched as Harris ran to one end of the basement with Baskerville in pursuit, and Spain ran to the other end of the basement with Moses and Taylor in pursuit. Brockington was being pulled along by Taylor. Moses shot Spain at least seven times, which resulted in Spain's death. Taylor shot Brockington in the neck and shoulder and tried to shoot him in the face after he fell. Brockington

remained conscious. He watched from the ground as Moses and Taylor ran to the other side of the basement in the direction of Harris and Baskerville. More shots were fired, resulting in Harris' death. As the assailants left the basement, Brockington called out for Spain. Taylor came back, stood over Brockington, and shot him again in the chest.

Brockington slipped in and out of consciousness. After a while, Brockington managed to get up and out of the house. He was found face down on the sidewalk, bleeding profusely from eight gunshot wounds, by his father, McManus, and Wilder. To the three of them, and to the first officers on the scene, Brockington stated, "Keon shot me." (J.A. 647).

On February 22, 2002, in the 1800 block of Mount Street in Baltimore, Michael Taylor killed McManus, one of the witnesses relevant to the homicides on September 23, 2001. In fact, McManus had seen Moses moments before the murder looking for Spain and had heard Brockington say, "Keon shot me," (J.A. 647), after Brockington made his way out of his grandmother's house.

At about 5:00 p.m. that day, a minister who happened to be driving through the block saw a lone gunman, wearing a hoodie, chasing McManus and shooting at him. McManus fell, and the gunman stood over him and shot him again before running away, leaving McManus dead with $200 on his person.

In May 2002, law enforcement officers were investigating the murder of Vance Beasley.[3] In connection with that investigation, the officers executed a search warrant at Taylor's house and recovered a letter written to Taylor in early February 2002 by Moses, who was in jail pending a state trial for the September 23, 2001 murders of Spain and Harris. The letter contained instructions to Taylor to kill McManus. In fact, Moses had identified McManus as the one who could hurt Moses without Taylor's intervention. The letter said, "His

---

[3]According to the government, Taylor participated with Foster and Gregory Parker in the murder of Beasley, purportedly to avenge the deaths of Derek Hamlin and Kiari Cromwell, two drug dealers from Lexington Terrace.

statements can hurt me[,] dog. I don't gotta say it, you know what I mean?" (J.A. 726).

Butler testified that, prior to McManus's murder, Taylor and Butler had seen McManus on the street on two different occasions, and Taylor discussed killing McManus. On the first occasion, there were too many witnesses around. On the second occasion, Taylor did not have his firearm. In a subsequent recorded conversation, Butler confronted Taylor with McManus's murder, and Taylor did not deny committing the crime.

On April 15, 2002, in the 300 block of North Stricker Street, Baltimore, Taylor and Foster attempted to kidnap Wilder, who had been standing with McManus after Brockington was shot. As indicated earlier, Wilder was close friends with Brockington, Spain, McManus, and Harris.

The state trial against Moses for the Calhoun Street murders began on April 15, 2002. Taylor and Foster, with Moses's girlfriend, Linnea Prout, were present in court watching the testimony. Foster and Taylor had driven to court with Prout, and, on the way home, Foster and Taylor detoured through Stricker and Saratoga Streets, looking for someone. After Taylor and Foster dropped off Prout, they went back to the 300 block of North Stricker Street. Once there, Taylor and Foster jumped out of the vehicle, Taylor grabbed Wilder from behind, and there was a struggle. Wilder pulled out a gun and shot Foster. Foster was taken to the hospital. Wilder and the gun were recovered, and Wilder was charged with attempted murder. Foster's statement to the police, as the victim of that shooting, was that he and Taylor were just trying to bring Wilder to court. In a recorded conversation, Taylor told Butler that they wanted to sit with Wilder at Moses's trial to intimidate Brockington during his testimony.

On the evening of June 11, 2002, Jay Rhodes, a crack addict and regular customer at Lexington Terrace, traveled in his car from Glen Burnie, Maryland with his friend, Joe Morris, to Lexington Terrace to purchase crack. After purchasing some crack, the pair returned to Glen Burnie where they smoked it. Desiring more crack, they returned to Lexington Terrace later that evening. The problem for the pair was that neither had money. So Rhodes and Morris decided to try

to steal some crack from a Lexington Terrace dealer. The plan was to let a dealer come up to Rhodes' car at which time Morris would snatch the crack away from the dealer without paying for it.

Rhodes and Morris arrived in Lexington Terrace and pulled up to a dealer, who asked Morris if he was interested in purchasing crack. After Morris indicated that he was so interested, the dealer instructed Rhodes to drive around the block and return. Upon returning, Rhodes stopped his car, where several dealers were now congregating. Once stopped, Foster entered the car through a rear passenger door. Foster then asked, "Where the money at?" (J.A. 1025). Rhodes responded that they did not have any money, adding that they were just trying to see if any dealers had crack so that they could later return and buy some. Foster responded, "[n]ah, this is not going down like that," (J.A. 1025), and proceeded to put a gun to Rhodes' head, instructing Rhodes and Morris to get out of the car. After they complied, Rhodes attempted to reenter the car, but Foster pointed the gun over the roof of the car and said, "[n]o, you're not getting back in my car." (J.A. 1027). Foster, with the help of others, then escorted Rhodes and Morris to an alley and told them to strip. As Morris started to take his clothes off, he ran down the alley and was able to escape. Rhodes also tried to escape, but was caught and severely beaten. Law enforcement later recovered Rhodes' car on July 5, 2002.

B

On September 17, 2002, a grand jury sitting in the District of Maryland returned an indictment, charging Foster, Moses, and Taylor with conspiracy to possess with the intent to distribute and to distribute fifty grams or more of crack, 21 U.S.C. § 846. Foster was also charged with two counts of murder by use of a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(j) (one concerning the murder of Beasley, the other concerning the murder of Cortez Bailey, a rival drug dealer), one count of witness tampering (concerning the attempt to kidnap Wilder), *id.* § 1512(b)(3), one count of using a firearm during and in relation to a crime of violence (namely, the carjacking), *id.* § 924(c), and one count of carjacking, *id.* § 2119. Moses was also charged with three counts of murder by use of a firearm during and in relation to a drug trafficking crime (concerning the deaths of Spain, Harris, and McManus), *id.* § 924(j), and one count

of using a firearm during and in relation to a drug trafficking crime (concerning his possession of a firearm on the day of the Spain and Harris murders), *id.* § 924(c). Taylor was also charged with two counts of causing death with a firearm during and in relation to a drug trafficking crime, *id.* § 924(j) (one concerning the murder of Beasley and the other concerning the death of McManus), and one count of witness tampering, *id.* § 1512(b)(3) (concerning the attempt to kidnap Wilder).[4] All of the counts, except for the conspiracy count, charged the defendants under an aiding and abetting theory as well, *id.* § 2. The indictment sought the death penalty against Taylor and Moses. Superseding indictments were returned, but the charges against the defendants essentially remained unchanged.

Prior to trial, the district court dismissed the two § 924(j) counts against Foster and one of the § 924(j) counts against Taylor (the one concerning the murder of Beasley). On April 1, 2004, the jury returned verdicts of guilty on all remaining counts as to each of the defendants. Following the capital sentencing phase of the trial pertaining to Taylor and Moses, on April 28, 2004, the jury recommended a sentence of life imprisonment.

On July 23, 2004, Moses was sentenced to life without the possibility of release on the conspiracy count, concurrent sentences of life without the possibility of release on the § 924(j) counts, and a consecutive sentence of ten years' imprisonment on the § 924(c) count. On that same day, Taylor was sentenced to life without the possibility of release on the conspiracy count, a concurrent sentence of life without the possibility of release on the remaining § 924(j) count, and a concurrent sentence of ten years' imprisonment on the witness tampering count. On July 26, 2004, Foster was sentenced to life without the possibility of release on the conspiracy count, a concurrent sentence of ten years' imprisonment on the witness tampering count, a concurrent sentence of twenty-five years' imprisonment on the carjacking count, and a consecutive sentence of seven years' imprisonment on the § 924(c) count. Each defendant noted a timely appeal.

---

[4]Taylor was not charged with any offenses related to the Spain and Harris murders because he was a juvenile on the date of those murders.

## II

The defendants claim that the government, through a statement made during the course of a lengthy rebuttal argument, constructively amended the indictment from an indictment charging a large, loose-knit conspiracy into one charging a much smaller conspiracy. Specifically, the defendants complain about the following comment: "[Y]ou are the final deciders of what that conspiracy looks like, entirely up to you. You can go big. You can go small." (J.A. 1941). Following an objection, the district court stated, "[w]ell, in order to convict, they have to find the conspiracy charged in the indictment and that's, as she said, it's their decision." (J.A. 1941).

A constructive amendment to an indictment occurs when either the government (usually during its presentation of evidence and/or its argument), the court (usually through its instructions to the jury), or both, broadens the possible bases for conviction beyond those presented by the grand jury. *United States v. Floresca*, 38 F.3d 706, 714 (4th Cir. 1994) (*en banc*). We have referred to constructive amendments of a federal indictment as fatal variances because "the indictment is altered to change the elements of the offense charged, such that the defendant is actually convicted of a crime other than that charged in the indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999) (citation and internal quotation marks omitted). Constructive amendments are error *per se* and, given the Fifth Amendment right to be indicted by a grand jury, "must be corrected on appeal even when not preserved by objection." *Floresca*, 38 F.3d at 714.

When considering a constructive amendment claim, "it is the broadening [of the bases for a defendant's conviction] that is important-nothing more." *Id.* at 711. As explained in *Floresca*, "[i]t matters not," when a constructive amendment has occurred, "whether the factfinder could have concluded" that the defendant was guilty even if the amendment had not occurred. *Id.* The key inquiry is whether the defendant has been tried on charges other than those made in the indictment against him. *Id.*

We find that the defendants were not tried on charges other than those contained in the indictment. First, the district court's conspiracy

instruction tracked the drug conspiracy charged in the indictment. Second, the evidence introduced by the government at trial was consistent with the conspiracy alleged in the indictment. Third, the jury was instructed that the arguments of counsel did not constitute evidence and could not supersede any evidence before the jury. Fourth, in the very same argument of which the defendants complain, the government indicated to the jury that it was the jury's responsibility to determine if the government proved the conspiracy "charged in the indictment." (J.A. 1888). In short, we simply cannot conclude that the defendants were tried on charges not contained in the indictment. *Cf. United States v. Williams*, 106 F.3d 1173, 1176 & n.2 (4th Cir. 1997) (no impermissible amendment when indictment alleged distribution of methamphetamine and prosecutor's closing argument indicated that admission to distribution of marijuana proved guilt, because jury was instructed that closing argument was not evidence and the district court instructed the jury that the government had the burden of proving beyond a reasonable doubt that the defendant distributed a mixture and substance containing methamphetamine); *United States v. Russo*, 708 F.2d 209, 212-14 (6th Cir. 1983) (no impermissible amendment of indictment charging extortion by threats of economic loss when evidence introduced at trial demonstrated extortion by threats or fear of violence because jury instructions clearly limited charge to extortion by threat of economic loss).

## III

Taylor and Moses challenge a response made by the district court to a question from the jury concerning the § 924(j) count that charged Taylor and Moses with the murder of McManus by use of a firearm during and in relation to the drug conspiracy.[5] The indictment on this count charged that Taylor and Moses were guilty under 18 U.S.C. §§ 2 and 924(j). Notably, the indictment did not use language regarding any other persons, known or unknown to the grand jury, who may have participated in the offense. Moreover, the parties stipulated at trial that Moses was incarcerated on the day of McManus's murder.

---

[5]Section 924(j) provides that a person, who in the course of violating 18 U.S.C. § 924(c) causes the death of a person through the use of a firearm, shall, if the killing is a murder, be punished by death or by imprisonment for any term of years or for life. 18 U.S.C. § 924(j).

During deliberations, the jury asked the following question concerning this count: "[R]egarding 'aiding and abetting,' does the other person have to be Michael Taylor in order for Keon Moses to be guilty?" (J.A. 1999). In asking the question, the jury attached a page from the instructions and circled the portion stating, "Obviously, no one can be convicted of aiding or abetting the criminal acts of another if no crime was committed by the other person in the first place." (J.A. 2000).

In response to the jury's question, the district court stated:

> Mr. Moses and Mr. Taylor are charged in Count V with killing Mr. McManus. Mr. Moses, who was incarcerated the day of the murder, is charged on an aiding and abetting theory. You must deliberate and decide whether Mr. Moses has been proven guilty independent and separately from your deliberation and decision as to Mr. Taylor and reach a separate verdict as to each defendant. As to Mr. Moses, however, the other person whom he is charged with aiding and abetting in killing Mr. McManus is Mr. Taylor. To the extent there is evidence that Mr. Moses aided and abetted anyone to kill Mr. McManus, and Mr. Moses denied having done so, there is no evidence that he aided and abetted anyone other than Mr. Taylor. So, it is up to you [to] decide whether the [g]overnment has proved beyond a reasonable doubt that Mr. Moses aided and abetted Mr. Taylor in killing Mr. McManus.

(J.A. 1995-96). Taylor and Moses contend that this response was erroneous because it "(1) was improper for the Judge to state a conclusion of fact and (2) the trial court's interpretation of aiding and abetting was mistaken." Appellants' Br. at 32.

We review a district court's decision to respond to a jury's question, and the form of that response, for an abuse of discretion. *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995). "[I]n responding to a jury's request for clarification on a charge, the district court's duty is simply to respond to the jury's apparent source of confusion fairly and accurately without creating prejudice." *Id.* An error requires reversal only if it is prejudicial in the context of the record as a whole.

*United States v. United Med. & Surgical Supply Corp.*, 989 F.2d
1390, 1406-07 (4th Cir. 1993).

In this case, the district court acted within its discretion in respond-
ing to the jury's question. At trial, the government sought to prove
that Taylor murdered McManus at Moses's direction. The govern-
ment never suggested, through the indictment or the evidence pre-
sented at trial, that some third party was responsible for McManus's
murder or that Moses, while incarcerated, aided and abetted any other
person other than Taylor. The defense countered with a defense of
mistaken identity. Given the manner in which the count was before
the jury, the court correctly told the jury that Moses was being
charged under an aiding and abetting theory, as he could not have
been a principal in McManus's murder. The court then wisely
informed the jury to consider the guilt of Moses independently from
its consideration of Taylor's guilt and to reach separate verdicts as to
each defendant. This portion of the court's response reminded the jury
that it was required to separately determine whether the government
met its burden of proof as to each defendant. Thus, contrary to Taylor
and Moses's suggestion, the court did not instruct the jury that Taylor
shot McManus. Finally, considering the fact that the only possible
person that Moses could have aided and abetted was Taylor, the court
correctly instructed the jury to decide whether the government proved
beyond a reasonable doubt that Moses aided and abetted Taylor in the
murder of McManus. Thus, the court prudently prevented the jury
from basing a guilty verdict on evidence not before it, *i.e.*, that Moses
aided and abetted some unknown third party's commission of the
McManus murder.

IV

The defendants challenge the sufficiency of the evidence to support
several of their convictions. A jury's verdict must be upheld on appeal
if there is substantial evidence in the record to support it. *Glasser v.
United States*, 315 U.S. 60, 80 (1942). "[A]n appellate court's reversal
of a conviction on grounds of insufficient evidence should be con-
fined to cases where the prosecution's failure is clear." *United States
v. Jones*, 735 F.2d 785, 791 (4th Cir. 1984) (citation and internal quo-
tation marks omitted). In determining whether the evidence in the
record is substantial, we view the evidence in the light most favorable

to the government and inquire whether there is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (*en banc*). A defendant challenging the sufficiency of the evidence faces a heavy burden. *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997). In evaluating the sufficiency of the evidence, we do not review the credibility of the witnesses and assume that the jury resolved all contradictions in the testimony in favor of the government. *United States v. Romer*, 148 F.3d 359, 364 (4th Cir. 1998).

## A

Taylor and Moses contend there is insufficient evidence to support the jury's verdict on the § 924(j) count related to the murder of McManus. This argument is without merit.

Section 924(j) provides that a person, who in the course of violating 18 U.S.C. § 924(c) causes the death of a person through the use of a firearm, shall, if the killing is a murder, be punished by death or by imprisonment for any term of years or for life. 18 U.S.C. § 924(j). The § 924(j) count related to the McManus murder and charged that Taylor used a firearm in connection with the drug conspiracy count. Thus, with respect to this count, the government was required to prove three elements with regard to Taylor: (1) that Taylor committed the predicate drug conspiracy offense; (2) that Taylor used the firearm during and in relation to the drug conspiracy offense; and (3) that, in the course of using that firearm, Taylor caused the murder of McManus. *Cf. United States v. Wallace*, 447 F.3d 184, 187 (2d Cir. 2006) (discussing elements of a § 924(j) offense). With regard to Moses, the government was required to prove that Moses participated at some stage of the illegal venture with knowledge of the result and the intent to bring about that result. *United States v. Arrington*, 719 F.2d 701, 705 (4th Cir. 1983) (discussing elements of aiding and abetting).

Taylor and Moses contend that there is insufficient evidence in the record to support the jury's finding that Taylor murdered McManus. In our view, the jury was presented with substantial circumstantial evidence from which to find that Taylor murdered McManus.

First, Butler testified regarding two occasions on which he and Taylor saw McManus. On the first occasion, Taylor had a gun with him and wanted to kill McManus. Butler talked him out of it because of the number of people around. On the second occasion, Taylor did not have a gun and, thus, felt that he could not kill McManus.

Second, the circumstances of McManus's murder suggested an assassination, as opposed to some other motivation. McManus was chased on the street by the shooter, with witnesses around. He was shot in the head, and he had over $200 on his person at the time of his death. The money was not taken. Therefore, the jury could infer that the motive of the shooter was not robbery. Third, the jury heard a taped conversation between Butler and Taylor, in which Butler confronted Taylor with the McManus killing, and Taylor did not deny it.

Fourth, the jury saw the letter from Moses to Taylor instructing Taylor to kill McManus. After talking about how he was going to ensure that another witness changed his statement, Moses said, "S___P. That nigga. His statement can hurt me[,] dog. I don't gotta say it, You know what I mean?" (J.A. 2064-65). In our view, this circumstantial evidence, taken in totality and viewed in the light most favorable to the government, is sufficient to sustain the jury's finding that Taylor murdered McManus.

Moses additionally argues that the evidence is insufficient to demonstrate that he aided and abetted the commission of a § 924(j) offense. More specifically, he argues that the government failed to establish that he had actual knowledge that a firearm would be used to kill McManus. Here, the evidence showed that Moses had instructed Taylor to kill McManus in order to prevent his testimony at Moses's state trial.[6] The jury also heard extensive evidence that members of the conspiracy routinely used firearms to kill rival drug dealers, for example, in the case of Spain and Harris. In view of this evidence, we find no merit to Moses's argument that he had no knowledge that a firearm would be used to kill McManus. The jury

---

[6]As noted earlier, Moses was tried in state court for the murders of Spain and Harris.

was presented with substantial evidence from which to find that Moses aided and abetted Taylor's murder of McManus.[7]

B

Foster argues that the evidence is insufficient to support the jury's determination that he had the *mens rea* required by the carjacking statute, 18 U.S.C. § 2119.[8] More specifically, he contends that the evidence is inadequate to support the jury's finding that he intended to steal Rhodes' car or, alternatively, that he would have seriously harmed Rhodes to obtain the car. In response, the government posits that the evidence is adequate to support the jury's determination that Foster intended to steal Rhodes' car and was prepared to seriously harm or kill Rhodes had he resisted Foster's efforts to obtain the car.

---

[7]In support of his argument, Moses relies on *United States v. Spinney*, 65 F.3d 231, 238-39 (1st Cir. 1995), which vacated the firearms conviction of an accomplice to a bank robbery. Moses's reliance on *Spinney* is misplaced. In *Spinney*, the firearm was a handgun that was not visible when the robber entered the bank, and the accomplice charged with aiding and abetting remained outside of the bank. Moreover, the use of the firearm in *Spinney* was not contemplated at the planning stages of the robbery, while here the jury could infer that it was so contemplated in this case.

[8]The federal carjacking statute states:

> Whoever, with the intent to cause death or serious bodily harm[,] takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—
>
>> (1) be fined under this title or imprisoned not more than 15 years, or both,
>>
>> (2) if serious bodily injury [defined in a different statute] results, be fined under this title or imprisoned not more than 25 years, or both, and
>>
>> (3) if death results, be fined under this title, or imprisoned for any number of years up to life, or both, or sentenced to death.

18 U.S.C. § 2119.

To obtain a conviction for carjacking under § 2119, the government must prove that the defendant "(1) with intent to cause death or serious bodily harm (2) took a motor vehicle (3) that had been transported, shipped or received in interstate or foreign commerce (4) from the person or presence of another (5) by force and violence or intimidation." *United States v. Applewhaite*, 195 F.3d 679, 685 (3d Cir. 1999) (citation and internal quotation marks omitted).

The intent requirement of § 2119 is satisfied when the government proves that, at the moment the defendant demanded or took control of the vehicle, the defendant possessed the intent to seriously harm or kill the driver if necessary to steal the car. *Holloway v. United States*, 526 U.S. 1, 12 (1999). The government need not prove that the defendant actually intended to cause the harm; it is sufficient that the defendant was conditionally prepared to act if the person failed to relinquish the vehicle. *United States v. Wilson*, 198 F.3d 467, 470 (4th Cir. 1999). The "taking" element of § 2119 is satisfied when defendant takes control of the victim's vehicle, even if he does not force him to relinquish it. *See, e.g.*, *United States v. Moore*, 73 F.3d 666, 669 (6th Cir. 1996).

The evidence that Foster placed a gun to Rhodes' head and ordered both Rhodes and Morris out of the car permitted the jury to conclude that Foster obtained control of Rhodes' car. This conclusion is further buttressed by other evidence, such as Foster's statement to Rhodes after Rhodes attempted to reenter the car,"[n]o, you're not getting back in *my* car," (J.A. 1027) (emphasis added), and the evidence that the car was recovered a month later. All of this evidence allowed the jury to infer that, at the moment Foster obtained control of Rhodes' car, he possessed the intent to seriously harm or kill Rhodes if necessary to obtain control of the car. *Cf. United States v. Harris*, 420 F.3d 467, 474-78 (5th Cir. 2005) (carjacking conviction could not stand where evidence did not establish that force was the means of stealing the car); *United States v. Lebron-Cepeda*, 324 F.3d 52, 57 (1st Cir. 2003) (intent element satisfied where one defendant placed a gun against the driver's head and threatened him at the inception of the carjacking, thereby permitting the inference that the defendant would have shot the driver had the driver failed to relinquish control of the car); *United States v. Adams*, 265 F.3d 420, 424 (6th Cir. 2001) (evidence sufficient to support intent finding where the defendant threat-

ened and then physically touched the carjacking victims with his gun); *Applewhaite*, 195 F.3d at 685 (carjacking conviction could not stand where evidence did not establish that force was used to obtain the victim's van); *United States v. Lake*, 150 F.3d 269, 272 (3d Cir. 1998) (evidence sufficient to support intent finding where defendant placed a gun near the head of the victim and asked for her keys). Accordingly, we conclude the evidence in the record is sufficient to support Foster's carjacking conviction.

C

Foster and Taylor also challenge the sufficiency of the evidence to support their witness tampering convictions under 18 U.S.C. § 1512(b)(3).[9] At trial, the government presented evidence that, in April 2002, Foster and Taylor attempted to kidnap Wilder and bring him to Moses's state court trial in order to intimidate Wilder's friend, Brockington, who was expected to testify against Moses. The government's evidence further showed that the federal investigation into drug dealing and the related violence in the Lexington Terrace neighborhood started in the fall of 2001 and that the homicides that were the subject of the state court trial against Moses were within the scope of that investigation.

Our leading case on the reach of § 1512(b)(3) is *United States v. Perry*, 335 F.3d 316 (4th Cir. 2003). In that case, the defendant was charged with violating § 1512(b)(3) after he had been arrested in Maryland by Montgomery County police officers for various weapons violations stemming from his possession in his vehicle of, among

---

[9]Section 1512(b)(3)provides, in relevant part:

> Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings . . . shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 1512(b)(3).

other things, a loaded handgun with an obliterated serial number. *Perry*, 335 F.3d at 318. The defendant told the officers that, if they would throw away the gun, he would give them certain information. *Id.* The defendant lied to the officers about his name and birth date. *Id.*

On the appeal following his conviction, the defendant argued that the government failed to prove that, in lying to the police officers about his name and birth date, he intended to prevent the communication of information to federal officers relating to the possible commission of a federal offense. *Id.* at 320. In analyzing this contention, we explained that the jurisdictional basis for § 1512(b)(3) is "the federal interest of protecting the integrity of potential federal investigations by ensuring that transfers of information to federal law enforcement . . . relating to the possible commission of federal offenses be truthful and unimpeded." *Perry*, 335 F.3d at 321 (citation and internal quotation marks omitted). We went on to conclude that § 1512(b)(3) required the government only to "establish that the defendants had the intent to influence an investigation that happened to be federal." *Perry*, 335 F.3d at 321 (citation and internal quotation marks omitted). We held that the government had met that standard because it showed that a portion of the potential investigation that the defendant intended to impede—the "investigation into Perry's status as a felon in possession of a firearm"—was federal in nature. *Id.* Thus, even though no federal investigation had begun at the time the defendant committed his obstructive act and even assuming that he was not aware "that a portion of the firearms investigation would be federal," the government's evidence was sufficient to support his conviction. *Id.* at 321-22. In so holding, we rejected the defendant's contention that "the Government, in order to obtain a conviction . . . , was required to show that the MCPD was, at the time of the arrest, cooperating in an ongoing federal investigation or in the investigation of a federal offense." *Id.* at 322 n.9. We added that § 1512(b)(3) "does not require that . . . communication with federal officers be . . . imminent." *Perry*, 335 F.3d at 322 n.9 (citation and internal quotation marks omitted). We also rejected the defendant's suggestion that § 1512(b)(3) requires "that federal officials actually receive the misleading information," noting that the statute "applies to one who engages in misleading conduct with an intent to 'hinder, delay, or prevent' communication with federal law enforcement officers. It does

not require that the individual have succeeded." *Perry*, 335 F.3d at 322 n.9.

Foster and Taylor contend that their witness tampering convictions under § 1512(b)(3) must be reversed because their convictions rest "on an inadequate nexus to a federal investigation." Appellants' Br. at 47. According to Foster and Taylor, there was no federal nexus because: "(1) the federal investigation did not exist at the time of the alleged act; (2) the 'victim' was not aware that he was part of a federal investigation; and (3) there was no objective reason to think" that a federal investigation would be influenced. Appellants' Br. at 47-48.

Our decision in *Perry* disposes of these contentions. As recognized in *Perry*, a federal investigation was not necessary at the time Foster and Taylor attempted to bring Wilder to state court to influence Brockington's testimony. 335 F.3d at 321-22. In any event, the government's evidence at trial demonstrated that a federal investigation into drug dealing and related violence had begun in Lexington Terrace in the fall of 2001. Nor was the government required to prove that Foster or Taylor were aware of that federal investigation. *Id.* at 322 n.9. Finally, there simply is no merit to Foster and Taylor's contention that by their actions they did not attempt to influence a federal investigation. Based on the evidence before it, the jury was entitled to conclude that Foster and Taylor attempted to kidnap Wilder with the intent to hinder or prevent Brockington from further communicating with law enforcement authorities, including federal law enforcement authorities. *Cf. United States v. Harris*, 498 F.3d 278, 286 (4th Cir. 2007) (in affirming convictions under 18 U.S.C. §§ 1512(a)(1)(C) and (a)(2)(C), court noted that a "portion of the potential investigation that [the defendants] sought to prevent 'happened to be federal' because drug trafficking is a federal offense. That McAbier had communicated previously with local law enforcement and that those communication[s] had not spawned a federal investigation are red herrings here").

V

As part of its charge to the jury on the drug conspiracy count, the district court instructed the jury to determine, in the event they found a particular defendant guilty of participating in the charged conspir-

acy, the amount of crack "involved in the conspiracy." (J.A. 1720). The jury was given three choices in the court's instructions as to crack amounts, "50 grams or more, five grams or more, but less than 50 grams, or less than five grams of crack cocaine." (J.A. 1720). Consistent with the court's instructions, the verdict form asked the jury to determine the amount of crack "attributable to the conspiracy." (J.A. 2070). As to each defendant, the jury found that the conspiracy involved fifty or more grams of crack. In sentencing each defendant to life imprisonment on the drug conspiracy count, the court found that each defendant was responsible for more than fifty grams of crack.

The defendants contend that the district court should have instructed the jury that, in determining the drug quantity attributable to each defendant, the jury must determine the quantity that was in furtherance of the conspiracy and reasonably foreseeable to each defendant as opposed to the conspiracy as a whole. The defendants posit that such a failure by the court below runs afoul of the principles laid out in our decision in *United States v. Collins*, 415 F.3d 304, 314 (4th Cir. 2005).

Because the defendants failed to raise this *Collins* issue in the district court, our review is for plain error. *United States v. Olano*, 507 U.S. 725, 732 (1993). On plain error review, we will reverse the district court only if we (1) identify an error, (2) which is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Id.* A defendant found guilty under 21 U.S.C. § 846 is "subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy." 21 U.S.C. § 846. Since a violation of 21 U.S.C. § 841(a)(1) was the object of the conspiracy, the defendants are subject to the penalties outlined in 21 U.S.C. § 841(b).

Section 841(b) of Title 21 sets forth a graduated penalty scheme based on the quantity of drugs attributable to the defendant. *See id.* § 841(b) (setting forth statutory minimums and maximums based on drug amounts). In *Collins*, we addressed the issue of whether a defendant found guilty of a conspiracy to violate § 841(a) should be sentenced under § 841(b) by considering the amount of drugs distributed by the entire conspiracy. *Collins*, 415 F.3d at 312. We answered this

question in the negative, holding that such a sentence should be more individualized, subjecting the defendant to punishment only for distribution of the amount of drugs "attributable to him." *Id.*

Our decision in *Collins* relied on previous decisions of the Supreme Court and this court. For example, we first looked to our prior decision in *United States v. Irvin*, 2 F.3d 72 (4th Cir. 1993), where we held that the "most reasonable interpretation of the relevant statutory provisions requires a sentencing court to assess the quantity of narcotics attributable to each coconspirator by relying on the principles set forth in Pinkerton [*v. United States*, 328 U.S. 640 (1946)]." *Irvin*, 2 F.3d at 77; *see also id.* at 76 ("[T]he statutes require a district court to determine the accountability of each coconspirator for each object offense and the quantity of narcotics involved in each object offense using the principles of *Pinkerton*.").[10] We went on to explain in *Collins* that, in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *United States v. Promise*, 255 F.3d 150 (4th Cir. 2001), the holding of *Irvin* was modified "by effectively replacing the words 'a district court' with 'the jury,' and requiring proof beyond a reasonable doubt." *Collins*, 415 F.3d at 314.[11] Thus, under *Collins*, a district court

---

[10]In *Pinkerton v. United States*, 328 U.S. 640 (1946), the Supreme Court reviewed the law of conspiracy as it related to the liability of one conspirator for the substantive acts of another conspirator. The Court concluded that acts in furtherance of the conspiracy are "attributable to the others for the purpose of holding them responsible for the substantive offense." *Id.* at 647. The Court went on to note that a "different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement." *Id.* at 647-48. Thus, in addition to the requirement that acts be done in furtherance of the conspiracy, to be attributable to another conspirator, the acts must be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.

[11]In *Apprendi*, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Applying the

must "instruct a jury to use *Pinkerton* principles" when determining the amount of drugs attributable to any one defendant in a drug conspiracy. *Id.* In other words, in order for the statutory maximums and mandatory minimums of § 841(b) to apply in a drug conspiracy case, the jury must determine that the threshold drug amount was reasonably foreseeable to the individual defendant.[12]

In this case, the jury never determined the individualized quantity of crack attributable to each defendant for the penalty purposes of

---

*Apprendi* holding in *Promise*, we held that "*Apprendi* dictates that in order to authorize the imposition of a sentence exceeding the maximum allowable without a jury finding of a specific threshold drug quantity, the specific threshold quantity must be treated as an element of an aggravated drug trafficking offense, *i.e.*, charged in the indictment and proved to the jury beyond a reasonable doubt." *Promise*, 255 F.3d at 156-57.

[12]We recognize that other courts have held that, in drug conspiracy cases, the jury is not required to determine the amount of drugs attributable to individual coconspirators; rather, a jury's finding of drug amounts for the conspiracy as a whole sets the maximum sentence that each coconspirator could be given. *See, e.g.*, *United States v. Stiger*, 413 F.3d 1185, 1192-93 (10th Cir. 2005) (collecting cases). Because the subsequent attribution of drug amounts to an individual coconspirator cannot increase his maximum sentence, these courts reason that the sentencing court "may determine the drug quantity attributable to that defendant and sentence him accordingly (so long as the sentence falls within the statutory maximum made applicable by the jury's conspiracy-wide drug quantity determination." *Derman v. United States*, 298 F.3d 34, 43 (1st Cir. 2002). In other words, under this approach, the jury sets the maximum sentence (or ceiling) under which each coconspirator's sentence must fall, but the court may determine the floor by finding the precise drug quantity attributable to each coconspirator. *United States v. Knight*, 342 F.3d 697, 711 (7th Cir. 2003). Consequently, the jury is not required to make individualized findings as to each coconspirator because "[t]he sentencing judge's findings do not, because they cannot, have the effect of increasing an individual defendant's exposure beyond the statutory maximum justified by the jury's guilty verdict." *Id.* We express no opinion on the strength of the reasoning of these cases. *Collins* is the law in our circuit, and, as a panel of this court, we are bound to follow it. *See United States v. Chong*, 285 F.3d 343, 346 (4th Cir. 2002) (holding that one panel of this court cannot overrule another).

§ 841(b) and simply determined the amount of crack "attributable to the conspiracy." (J.A. 2070). Because the jury was not properly instructed under *Collins*, the defendants' jury did not properly determine the statutory threshold quantity of crack attributable to each of them. Accordingly, the first two prongs of *Olano* (error and plainness) are satisfied.

The third inquiry under *Olano* is whether the plain error affected the defendant's substantial rights. According to the *Olano* Court, the error "must have affected the outcome of the district court proceedings." 507 U.S. at 734. In this case, the defendants each received life sentences on the drug conspiracy count. Moses and Taylor also received life sentences on other counts of conviction; Moses received three life sentences for his § 924(j) convictions related to the murders of Spain, Harris, and McManus, and Taylor received a life sentence for his § 924(j) conviction related to the murder of McManus. Foster did not receive a life sentence on any other count of conviction; rather, he was sentenced to thirty-two years on his other counts of conviction (twenty-five years' imprisonment on his carjacking conviction plus a seven year consecutive sentence for his § 924(c) conviction, with the ten-year witness tampering sentence to be served concurrently).

In view of the life sentences Moses and Taylor received on other counts of conviction, they cannot establish that their substantial rights were affected by the *Collins* error. *See United States v. Ellis*, 326 F.3d 593, 599-600 (4th Cir. 2003) (holding that sentence exceeding statutory maximum by twenty years did not affect substantial rights because defendant received equal or longer concurrent sentences on other counts). Because Foster's life sentence on the drug conspiracy count exceeds the twenty-year statutory default maximum sentence, *see* 21 U.S.C. § 841(b)(1)(C) (setting twenty-year maximum sentence for crack offenses of less than five grams), his substantial rights were affected by the *Collins* error. *Cf. Promise*, 255 F.3d at 160-61 (holding that a sentence in excess of the authorized statutory maximum to which a defendant would not otherwise be subject affects his substantial rights). Consequently, in Foster's case, we must decide whether to exercise our discretion to notice the *Collins* error.

In *United States v. Cotton*, the Supreme Court held that the government's error in failing to allege a drug quantity in the indictment did

not seriously affect the fairness, integrity, or public reputation of judicial proceedings because the evidence that the conspiracy at issue involved at least fifty grams of crack, the minimum drug quantity required to support the enhanced sentence imposed by the district court, "was overwhelming and essentially uncontroverted." 535 U.S. 625, 633 (2002) (internal quotation marks omitted). As in *Cotton*, the evidence evidencing that Foster was responsible for in excess of fifty grams of crack was overwhelming and essentially uncontroverted. The government's evidence overwhelmingly established that he was a major player in the distribution of crack in Lexington Terrace. He sold crack, occasionally managed other dealers, and was an enforcer, willing to employ violence if needed, whether it was carjacking in the case of Rhodes or witness tampering in the case of attempting to kidnap Wilder. Although Foster was incarcerated during part of the charged time frame of the conspiracy, the violence employed by him allowed the lucrative drug trade in Lexington Terrace, where perhaps over fifty grams of crack were sold on a daily basis, to continue for a substantial period of time. Moreover, although Foster challenged the government's case against him, he primarily focused on whether he committed the offenses and not on the drug quantities reasonably foreseeable to him. Unquestionably, if the jury was properly instructed per *Collins*, the government's overwhelming evidence of the substantial quantities of crack reasonably foreseeable to Foster would have set the maximum sentence at life imprisonment, 21 U.S.C. § 841(b)(1)(A). Thus, the situation here is analogous to *Cotton*. *Cf. United States v. Smith*, 441 F.3d 254, 272-73 (4th Cir. 2006) (declining to notice *Booker* error where the jury, having convicted the defendant of various drug offenses, would have found the specific drug amounts charged in the indictment by relying on the testimony proffered by several witnesses). In short, if we disturbed Foster's sentence on the drug conspiracy count, we would seriously affect the fairness, integrity, and public reputation of judicial proceedings.

## VI

The defendants raised several additional arguments which they contend should be resolved in their favor. We have reviewed these arguments and find them to be without merit. Accordingly, for the reasons stated herein, the judgments of the district court are affirmed.

*AFFIRMED*