**AMENDED OPINION**

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 10-4375**

———————

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

     v.

ANTONIO ROBERTO ARGUETA, a/k/a Alex Antonio Cruz, a/k/a
Buda,

               Defendant - Appellant.

———————

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Deborah K. Chasanow, Chief District
Judge.  (8:05-cr-00393-DKC-6)

———————

Argued:  January 27, 2012        Decided:  March 21, 2012

Amended Opinion Filed:  March 27, 2012

———————

Before NIEMEYER and KEENAN, Circuit Judges, and J. Michelle
CHILDS, United States District Judge for the District of South
Carolina, sitting by designation.

———————

Affirmed by unpublished opinion.  Judge Childs wrote the
opinion, in which Judge Niemeyer and Judge Keenan joined.

———————

**ARGUED:** Marta Kahn, Baltimore, Maryland, for Appellant.  James
Marton Trusty, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt,
Maryland, for Appellee.  **ON BRIEF:** Rod J. Rosenstein, United
States Attorney, Baltimore, Maryland, Robert K. Hur, Assistant

United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

CHILDS, District Judge:

A jury convicted appellant Roberto Antonio Argueta on eight counts of criminal conduct related to his affiliation with the gang La Mara Salvatrucha (also known as "MS-13"), including numerous counts for conspiracy, racketeering, and murder. On appeal, Argueta contends that the district court erred during trial by permitting an expert witness to testify under a pseudonym and permitting cross-examination of a defense witness concerning his participation in a Buddhist meditation ritual. Argueta further argues that the evidence presented during trial was not sufficient to support the jury's findings on the racketeering charges, or to support the jury's verdicts on the indictments for conspiracy to murder, murder, and assault. Upon review, we find no error and affirm Argueta's convictions on all counts.

I.

MS-13 began in California in the 1980s with Central American youth as a means of self-protection and self-preservation. Gradually, the gang spread to other states and Central America, including El Salvador. The organization is broken down into separate subgroups or "cliques." However, the cliques share common rules, customs, rituals, and symbols. They also display similar colors, tattoos, hand-signs, and graffiti

3

to establish the gang's presence in certain communities. The common goals of the MS-13 cliques are to preserve the gang by fighting rival gang members or others perceived as threats to the gang, and to engage in criminal activity for the financial support of the gang.

Argueta is a member of a subgroup or "clique" of the MS-13 gang known as the Langley Park Salvatruchos ("LPS"). Other members of LPS referred to Argueta by the nickname "Buda." Argueta also occupied a leadership position within LPS.

In October 2004, LPS gang members murdered Nancy Diaz and attempted to murder Alyssa Tran. Ms. Diaz was the girlfriend of an LPS member and was rumored to be fraternizing with rival gang members. Because of her activities with rival gang members, Defendant allegedly ordered other LPS gang members to kill Ms. Diaz. LPS did not originally plan to kill Alyssa Tran. However, she became the target of the kill order because she accompanied Ms. Diaz to visit LPS members on the day of the murder.

As a result of Ms. Diaz's murder and other crimes, a federal grand jury returned a fourth superseding indictment against Argueta. He was charged with conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C.A. § 1962(d), two counts of assault in aid of racketeering activity in violation of 18 U.S.C.A. § 1959(a)(5), conspiracy to commit

4

murder in aid of racketeering in violation of 18 U.S.C.A. § 1959(a)(5), murder in the aid of racketeering in violation of 18 U.S.C.A. § 1959(a)(1), and three counts of use of a firearm in a crime of violence in the commission of a federal crime and death resulting from use of that firearm in violation of 18 U.S.C.A. §§ 924(c) and 924(j).

Prior to trial, the government sought leave to allow Juan Diaz (pseudonym), an El Salvadorian police officer to testify under a pseudonym because of concerns for his safety and other professional implications pertaining to the disclosure of his personal information. In an ex parte hearing, the government indicated that Mr. Diaz had previously testified in MS-13 conspiracy trials without disclosing his true name, address, place of birth, or other information that would tend to disclose his identity. The government further affirmed that Mr. Diaz's testimony would not include any observations of, or contact with, any of the defendants on trial in connection with the instant case and argued that such limitations on the officer's testimony should alleviate any concerns about the Sixth Amendment right to confrontation. The district court granted the government's motion, which allowed Mr. Diaz to testify under the pseudonym without disclosing any identifying information to the jury, Argueta, or Argueta's defense counsel.

During the trial, the government presented expert witness testimony from Mr. Diaz regarding the operations of the MS-13 gang. He testified about the general structure of the gang membership including the hierarchy of senior leadership within each clique. He also described the highest levels of leadership as "first word" and "second word," whose responsibilities included overseeing the clique's finances, disbursement and use of weapons, and discipline. Mr. Diaz further testified that only the clique leader designated as "first word" could issue orders authorizing or providing the "greenlight" for a murder.

The government also presented expert witness testimony from Frank Florez, a detective with the Los Angeles Police Department assigned to a gang task force. Mr. Flores testified regarding the history, characteristics, and operations of MS-13 in the United States and El Salvador. He also testified that leadership is obtained by earning a reputation through violent acts in allegiance to their motto of "matar, violar, controlar" or kill, rape, control. Flores further corroborated Mr. Diaz's testimony regarding "first word" and the issuance of a "greenlight" to kill targeted victims.

In addition to the expert witness testimony, the government presented several other witnesses in support of their case against Argueta. Jesus Canales testified that Argueta ordered the murder of Ms. Diaz at a meeting of the LPS clique. He also

6

testified that he participated in the murder of Ms. Diaz and the attempted murder of Ms. Tran with fellow LPS member Jeffrey Villatoro based on the order from Argueta. Alirio Osorio also testified that he heard Argueta issue the "green light" at a meeting and that Argueta was present on the day of Ms. Diaz's murder at which time he also authorized the plan to kill Ms. Tran. However, Ms. Tran, who survived a gunshot wound to the face and two stab wounds, testified that she did not see Argueta the day of the incident. Essentially, the government's theory of the case was that Argueta was the person in the LPS clique who held the position of "first word" at the time of Ms. Diaz's murder and that he was responsible for her murder.

Argueta's defense counsel presented an expert witness, Dr. Thomas Ward, in an attempt to refute some of the government's expert witness testimony regarding the MS-13 gang. Dr. Ward opined that decision making within the gang was a much more "organic" process and that "first word" has more to do with the structure of a meeting than decision-making authority. He further described the concept of a "green light" as more akin to a decision made by the consensus from the group instead of a decision left to the sole authority of "first word."

The jury convicted Argueta on all counts of the indictment. The district court sentenced him to life imprisonment plus a consecutive term of 420 months.

This appeal followed.

## II.

Argueta first contends that the district court erred in allowing an expert witness to testify on behalf of the government under a pseudonym without disclosing any of the witness's identifying information to Argueta's defense counsel. Specifically, Argueta argues that the district court violated his Sixth Amendment right of confrontation by allowing the government to withhold information such as the witness's true name, home and work addresses, or date and place of birth because he was prevented from conducting any investigation to aid in the cross-examination of the witness.

This issue is controlled by the court's recent decision in United States v. Ramos-Cruz, 667 F.3d 487 (4th Cir. 2012), where the court found that the district court did not err in allowing this same El Salvadorian police officer to testify under a pseudonym in another case concerning the MS-13 gang. In making this finding, the court noted that the right of confrontation is not absolute and that the trial court could limit cross-examination where the information sought poses an actual threat or danger to the witness. Id.

As was the case in Ramos-Cruz, the government provided Argueta with the substance of Mr. Diaz's testimony, which

8

concerned only general information regarding the MS-13 gang operations and did not specifically involve Argueta. The government also provided Argueta with transcripts of the witness's testimony in prior cases. Furthermore, the district court conducted an <u>in camera</u> review of affidavits attesting to the personal and professional safety implications of disclosing Mr. Diaz's true identity and conducted an <u>ex parte</u> hearing regarding the continuing danger to Mr. Diaz and his family. Based on this evidence of an actual threat to Mr. Diaz's safety, the district court allowed his testimony under the pseudonym.

For the reasons articulated in <u>Ramos-Cruz</u>, we find no abuse of discretion in the district court's decision to allow Mr. Diaz to testify under the pseudonym without disclosing any identifying information to Argueta's defense counsel. <u>See</u> <u>id.</u>


III.

Argueta also contends that the district court erred in allowing the government to cross-examine the defense's expert witness, Dr. Ward, regarding his participation in a Buddhist meditation ritual. Argueta argues that such cross-examination is contrary to Rule 610 of the Federal Rules of Evidence because the cross-examination attacked Dr. Ward's spiritual beliefs.

This court reviews a district court's evidentiary rulings for abuse of discretion. <u>United States v. Cole</u>, 631 F.3d 146,

9

153 (4th Cir. 2011).  Additionally, the scope of cross-examination is within the sound discretion of the district court.  United States v. McMillon, 14 F.3d 948, 956 (4th Cir. 1994).  In determining whether the district court has abused its discretion in an evidentiary ruling, the court will view the evidence in the light most favorable to the proponent and will find an abuse of discretion only where the ruling is arbitrary and irrational.  Id.

Rule 610 of the Federal Rules of Evidence prohibits the use of evidence related to a witness's religious beliefs to support or attack the witness's credibility.  Fed. R. Evid. 610. However, nothing in the rule proscribes references to religious matters for other legitimate purposes.  See id.

Here, Argueta presented Dr. Ward as an expert on street gangs.  However, the government sought to attack Dr. Ward's expertise by highlighting his numerous and varied research interests, including the use of urine in different cultures, mental retardation in the elderly, HIV clinical trials, and meditation.  With specific reference to Dr. Ward's interest in meditation, the government questioned Dr. Ward regarding his participation in a "dark retreat," a Buddhist meditation ritual. The ritual was listed as a research experience on Dr. Ward's online biographical summary posted by the university at which he worked as an adjunct professor.  The government did not inquire

10

as to the religious aspects of the ritual, but primarily focused on the logistics of the ritual and the possible psychological effects of the ritual.

Contrary to Argueta's assertions, the government's cross-examination of Dr. Ward was not intended to show that Dr. Ward's religious beliefs impaired his credibility, but rather to demonstrate that Dr. Ward's interests in a multitude of seemingly unrelated topics underscored his lack of expertise in any particular subject matter. Accordingly, the district court properly allowed the government to question Dr. Ward regarding his meditation experience.

IV.

Argueta also challenges the sufficiency of the evidence presented by the government in support of his convictions.

In reviewing a challenge to the sufficiency of evidence, this court must view the evidence in the light most favorable to the government and determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. United States v. Foster, 507 F.3d 233, 245 (4th Cir. 2007). We will uphold the verdict where substantial evidence supports it. Id. at 244-45. Substantial evidence consists of "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a

11

defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (internal citation omitted). In reviewing the evidence, the court does not weigh the credibility of the witnesses. United States v. Green, 599 F.3d 360, 367 (4th Cir. 2010). The court will reverse a verdict only in those cases of clear failure of proof by the government. Foster, 507 F.3d at 244–45. "A defendant challenging the sufficiency of the evidence faces a heavy burden." Id. at 245.

A.

Argueta first alleges that there was insufficient evidence to support the jury's verdict on the charges related to conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. He asserts that the government failed to meet its burden to prove that the alleged enterprise engaged in or affected interstate commerce. More particularly, Argueta argues that the government was required to show that the enterprise's activities had a substantial effect on interstate commerce.

To prove a violation of the RICO conspiracy statute, the government must demonstrate: 1) the existence of a conspiracy to participate in an enterprise; 2) that the enterprise affects interstate commerce through a pattern of racketeering activity; 3) that the defendant joined the conspiracy with knowledge of

12

the purpose of the conspiracy; and 5) that during the time the defendant was a member of the conspiracy, the defendant knew that someone would commit at least two racketeering acts in furtherance of the enterprise. See 18 U.S.C. § 1962; Salinas v. United States, 522 U.S. 52, 64 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."). In determining whether conduct of an enterprise affects interstate commerce, this court has rejected the argument that the government must make a substantial showing of the enterprise's connection to interstate commerce. United States v. Gray, 137 F.3d 765, 773 (4th Cir. 1998). Rather, the court has found that the government need only "meet the minimal standard required to satisfy the interstate commerce requirement." Id.; accord United States v. Lobo-Lopez, 2012 WL 665981, at *4 (4th Cir., March 1, 2012) (rejecting the defendant's arguments that the government must show substantial effects on commerce to meet its burden of proof and upholding a verdict against the defendant for conspiracy to violate RICO under circumstances similar to the circumstances of Argueta's case).

In support of its claims against Argueta on the indictments for conspiracy to violate RICO, the government presented

13

evidence that MS-13 members traveled from Maryland to Virginia to hunt for rival gang members and regularly traveled between the United States and Central America to conduct gang business. The government also offered evidence that weapons used by MS-13, specifically the LPS clique, were not manufactured in Maryland and traveled in interstate commerce. Additionally, the government provided evidence to demonstrate that MS-13 members used the United States mails, telephones, and the internet to communicate with one another within the United States and internationally. Finally, the government introduced evidence regarding the removal of graffiti in Langley Park, Maryland, which required out-of-state communications and services.

Many courts have found the type of evidence submitted by the government in this case to be sufficient to demonstrate an effect on interstate commerce sufficient to support a RICO conviction. See United States v. Mejia, 545 F.3d 179, 203-04 (2d Cir. 2008) (finding sufficient effects on interstate commerce where the enterprise's out-of-state members traveled to New York for meetings; enterprise funds were used to purchase firearms manufactured out of state; members of Mexican subunits of the enterprise acted as smugglers; leaders coordinated activities by making interstate telephone calls; and the enterprise smuggled narcotics internationally, transported stolen vehicles interstate, and sent money to individuals in El

14

Salvador); United States v. Delgado, 401 F.3d 290, 297 (5th Cir. 2005) (finding use of Western Union, telephones, the U.S. Postal Service, and pagers to transfer money and communicate with each other in furtherance of the group's criminal purposes was sufficient to demonstrate that the enterprise affected interstate commerce); United States v. Pipkins, 378 F.3d 1281 (11th Cir. 2004) (finding that RICO conspirators' use of instrumentalities of interstate commerce, including pagers, telephones, and mobile phones, affected interstate commerce); United States v. Muskovsky, 863 F.2d 1319, 1325 (7th Cir. 1988) (finding effect on interstate commerce based on the use of interstate telephone calls to verify credit card transactions). After carefully reviewing the record, we find that the evidence was sufficient to support the jury's verdict against Argueta on the indictments for conspiracy to violate RICO.

B.

Lastly, Argueta contests the sufficiency of the evidence offered by the government to support the jury's verdict convicting him of conspiracy to murder and murder of Ms. Diaz and the assault of Ms. Tran. His primary claim is that the government offered little direct evidence implicating Argueta in the crimes. Argueta further attacks the credibility and reliability of the witnesses presented by the government to offer evidence on these matters.

15

At trial, the government presented witness testimony regarding Argueta's role in the murder of Ms. Diaz and the assault of Ms. Tran. Alirio Osorio and Jesus Canales testified that Argueta issued a "greenlight" to kill Ms. Diaz at a meeting. Canales further testified that, on the day of the murder and assault, Argueta also authorized a plan to murder Ms. Tran. Although there were discrepancies concerning whether Argueta was present on the day of the murder and assault, the witnesses corroborated each other's testimony regarding Argueta's authorizations of the crimes.

It is the province of the jury, not the reviewing court, to "weigh[] the credibility of the evidence and resolve any conflicts in the evidence presented." United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997) (internal quotation marks and citation omitted).

We have reviewed the evidence supporting Argueta's convictions for conspiracy to murder, murder, and assault and we find the evidence more than sufficient to sustain the convictions.

V.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.