Rehearing granted, June 19, 2009 for the limited purpose of filing corrected opinion

**CORRECTED OPINION**

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 07-4770**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JERMAL DANIELS,

        Defendant - Appellant.

**No. 07-4771**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JERMAL DANIELS,

        Defendant - Appellant.

**No. 07-4777**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JERMAL DANIELS,

          Defendant - Appellant.

                    _____

Appeals from the United States District Court for the Western
District of North Carolina, at Charlotte.  Robert J. Conrad,
Jr., Chief District Judge.  (3:05-cr-00103-RJC-2; 3:05-cr-00265;
3:06-cr-00082)

                    _____

Argued:  October 30, 2008              Decided:  April 21, 2009

          Corrected Opinion Filed:  June 19, 2009

                    _____

Before GREGORY and DUNCAN, Circuit Judges,  and Richard  D.
BENNETT,  United  States  District  Judge  for  the  District  of
Maryland, sitting by designation.

                    _____

Affirmed in part, vacated in part, and judgment withheld in part
by unpublished opinion.  Judge Bennett wrote the opinion, in
which Judge Gregory joined.  Judge Duncan wrote a dissenting
opinion.

                    _____

**ARGUED:** Kevin Andre Tate, FEDERAL DEFENDERS OF WESTERN NORTH
CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Amy
Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville,
North Carolina, for Appellee.  **ON BRIEF:** Claire J. Rauscher,
Executive  Director,  Ross  Richardson,  FEDERAL  DEFENDERS  OF
WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for
Appellant.  Gretchen C. F. Shappert, United States Attorney,
Charlotte, North Carolina, for Appellee.

                    _____

Unpublished opinions are not binding precedent in this circuit.

BENNETT, District Judge:

Defendant Jermal Daniels ("Daniels") appeals his convictions and sentences for several offenses, including conspiracy to possess with intent to distribute one kilogram or more of heroin and 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841 and 846. In this appeal, Daniels raises three issues. First, Daniels argues that his arrest was not supported by probable cause and that the trial court erred in refusing to suppress evidence obtained as a result of the search of his person, the use of a key in the lock of an apartment where he resided, and the issuance of a search warrant for that same location. In addition, Daniels appeals his sentence for the convictions, contending that the trial court improperly applied offense level enhancements based on a finding that Daniels held a leadership role in the conspiracy and that he had obstructed justice. Finally, Daniels contends that the district court erred by failing to instruct the jury to find the amounts of drugs individually attributable to him under the conspiracy charge, in violation of United States v. Collins, 415 F.3d 304 (4th Cir. 2005). Because of this error, Daniels contends that his mandatory life sentence for the conspiracy charge cannot stand because a proper instruction would have permitted the jury to find a reduced drug quantity attributable to him, leading to a reduced statutory sentence under 21 U.S.C. § 841(b). We

3

affirm the district court's rulings on the suppression motions and the sentence enhancements. However, as to Daniels' challenge of the jury instructions, we find reversible <u>Collins</u> error and withhold judgment on the conspiracy charge for thirty days. The Government may choose between remand for resentencing under the default penalty provision in § 841(b)(1)(B) (providing for a sentence of ten years to life in prison), or remand for a new trial.

I.

On March 3, 2005, officers of the Charlotte Mecklenburg Police Department arrested one of their informants, Adreian Jackson, for selling drugs to another informant. (J.A. 125, 559.) Jackson was on pretrial release following his indictment in August of 2004 on charges of conspiracy to distribute illegal drugs. (J.A. 121, 554.) Officers learned in early 2005 that Jackson was trafficking in heroin and cocaine in violation of the conditions of his release and they conducted three controlled buys from Jackson, leading to his March 3rd arrest. (J.A. 125, 159-60, 295, 558, 591, 708-10, 713, 717.)

After agreeing to cooperate with the police, Jackson arranged to meet with Daniels, who was one of his suppliers, in the parking lot of a Bi-Lo grocery store on Albemarle Road in Charlotte, North Carolina. The police officers waited in the

4

grocery store parking lot and Jackson identified Daniels when he appeared in a burgundy Chevrolet Impala. (J.A. 168, 731.) Jackson also identified co-defendant Corey Edwards, who arrived separately in a red Ford Expedition. (J.A. 167-68.) Once Edwards entered the passenger's side of the Impala, the officers initiated a "take down" and arrested both defendants. (J.A. 168, 731.) Incident to the arrest, police searched Daniels' person and found four bundles, each containing ten bags, of heroin in his underwear. (J.A. 132, 734.) During their search of the Impala, police found two cell phones and approximately $2,200 in cash. (J.A. 740.)

After Daniels' arrest, Jackson rode with Detective Jimmy Messer to a nearby apartment complex, where Jackson identified cars within the complex as belonging to Daniels and his girlfriend, Toria Douglas. (J.A. 304.) After running the license plate on his girlfriend's car, the police pinpointed the address of 1305 Kelston Place, Apartment 106 as a residence of Daniels. (J.A. 317.) The police maintained surveillance on the apartment until an officer arrived with a key the police had seized from Daniels during his arrest. (J.A. 135-36.) Officers inserted and turned the key to confirm it unlocked the door to Apartment 106. (J.A. 135-36.)

After Daniels denied consent to search the apartment, Detectives Arthur Robson and Chris Kimbell applied for a search

5

warrant. (J.A. 58-61.) In their supporting affidavit, the officers asserted that a confidential and reliable informant pointed out the car as the vehicle owned and driven by Daniels. In addition, the application averred, inter alia, that Daniels possessed a key that unlocked the door to Apartment 106 of 1305 Kelston Place. (J.A. 58-61.) Officers later searched Apartment 106 and seized several baggies of heroin and powder cocaine, equipment used for packaging drugs, cash totaling $63,060, six firearms, a bulletproof vest, and different types of ammunition. (J.A. 755-64, 816, 825.)

Prior to trial, Daniels filed two Motions to Suppress, arguing that the court should not admit evidence and statements that were derived from the officers' strip search of his person, the unauthorized use of the key in the door of Apartment 106 of 1305 Kelston Place, and the subsequent search of that location pursuant to a warrant that was false and misleading. (J.A. 40, 234.) The district court held two suppression hearings to consider these arguments and denied both Motions to Suppress.

Defendant Daniels was one of eight defendants charged in a thirteen-count Third Superseding Indictment filed on May 25, 2006 in the United States District Court for the Western District of North Carolina. Count One charged Daniels with conspiracy to possess with intent to distribute one kilogram or more of heroin and 500 grams or more of cocaine in violation of

21 U.S.C. §§ 846 and 841(b)(1)(A). Count Five charged Daniels with possession with intent to distribute heroin and aiding and abetting in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) and 18 U.S.C. § 2. Count Six charged Daniels with possession with intent to distribute 500 grams or more of cocaine and aiding and abetting in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2. Count Seven alleged possession of a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). Count Eight alleged possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g). Count Thirteen alleged intimidating and threatening a witness in violation of 18 U.S.C. § 1512(b). (J.A. 371-77.)

On June 13, 2006, the jury returned its verdict convicting Daniels on all counts. With respect to Count One, the jury found that one kilogram or more of heroin was "reasonably foreseeable to [Defendant]" and that 500 grams or more of cocaine was "reasonably foreseeable to [Defendant]." (J.A. 1809.) A Presentence Investigation Report ("PSR") was prepared. As to Counts One, Five, and Six, the PSR recommended a four level enhancement to his base offense level pursuant to U.S.S.G. § 3B1.1(a), for Daniels' role as a leader. (J.A. 1886.) The PSR also recommended an additional increase of two levels pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. (J.A.

7

1886.) As to Count Thirteen, the PSR recommended an increase of eight levels, pursuant to U.S.S.G. § 2J1.21(b)(1)(A), because the offense included threatening a witness and causing the witness to recant statements made to law enforcement. (J.A. 1887.)

At the sentencing hearing, Daniels objected to the enhancements for obstruction of justice and leadership role, and objected to the statutory sentencing range of mandatory life imprisonment based upon threshold drug quantity, arguing that the drug amounts found by the jury could not be used because the jurors were improperly instructed regarding drug amounts. (J.A. 1778-88, 1829-32.) The court overruled Daniels' objections regarding the drug amounts found by the jury and the guideline enhancements for leadership role and obstruction of justice. (J.A. 1829-32, 1842, 1846.) The court imposed a life sentence on Count One to be served consecutively with a term of 60 months on Count 7 and concurrently with terms of 360 months for Counts 5 and 6 and terms of 120 months for Counts 8 and 13. (J.A. 1853-54.) This appeal followed.

II.

Daniels contends that his March 3, 2005 arrest was not based on probable cause. In addition, he argues that the district court erred in denying his Motions to Suppress, which

8

challenged the admissibility of evidence obtained as a result of the search of his person, the use of his key in the lock of Apartment 106 at 1305 Kelston Place, and the affidavit supporting the search warrant for that same location.

In considering Daniels' claims and the district court's denial of his Motions to Suppress, this Court reviews legal determinations de novo and factual findings for clear error. See United States v. Kitchens, 114 F.3d 29, 31 (4th Cir. 1997).

A.

Daniels contends that the police did not have probable cause to arrest him in the parking lot of the Bi-Lo grocery store on Albemarle Road on the evening of March 3, 2005, and that the evidence obtained as a result should have been excluded.[1]

We have explained that "[a]n officer has probable cause for arrest when, at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." United States v. Manbeck, 744 F.2d 360, 376 (4th Cir. 1984) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). The Supreme Court has held that the probable cause determination is made through consideration of "the totality of

---

[1] Daniels raised this argument in his pro-se supplemental brief filed with our permission.

the circumstances." Illinois v. Gates, 462 U.S. 213 (1983). In addition, the Court has noted that "even in making a warrantless arrest an officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'" Id. at 242 (quoting Jones v. United States, 362 U.S. 257, 269 (1960)).

An objective review of "totality of the circumstances" supports the conclusion that there was sufficient probable cause for Daniels' arrest. The police officers planned their take-down on the basis of information provided by their informant, Jackson, who had arranged to meet with Daniels to perform a drug deal in the parking lot of the Bi-Lo grocery store. While the officers were waiting, they witnessed a red Ford Expedition pull into the parking lot and they noticed that the driver was looking around and not getting out of his vehicle. Detectives Kimbell and Robson stated that these circumstances were suspicious because they knew from training and experience that suppliers sometimes conduct more than one transaction in the same location. (J.A. 130, 169.) Upon Daniels' arrival in the parking lot, police noted that the appearance of Daniels and his burgundy Impala corroborated the description that Jackson had earlier provided. In addition, Jackson had identified both Daniels and Edwards, who the police had already suspected of

10

engaging in illegal drug trafficking. Once Edwards had entered the passenger side of Daniels' Impala, the officers had determined that there was sufficient probable cause to initiate the take-down. In view of this sequence of events, as exhibited in the record, we conclude that "the facts and circumstances within the officers' knowledge" supported their belief that Daniels was committing an offense and that probable cause existed for his arrest. See Manbeck, 744 F.2d at 376.

B.

Next, Daniels contends that the district court erred in refusing to suppress the four bundles of heroin obtained by the arresting officers' unconstitutional strip search of his person.

Upon arrest an officer may search the person of the arrestee and the area within the arrestee's immediate control. Illinois v. Lafayette, 462 U.S. 640, 644 (1983). However, such searches must be reasonable under the Fourth Amendment. In Bell v. Wolfish, 441 U.S. 520, 559 (1979), the Supreme Court prescribed an analytical framework for assessing the reasonableness of a search that balances the need for the search against any invasion of personal rights that may result. The inquiry involves a contextual weighing of the totality of the circumstances, including "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id.

11

At the suppression hearing Detective Kimbell testified that he physically pulled the waistband of defendant's sweatpants outward approximately three inches and looked straight down into his underwear with a flashlight and that he did so without exposing Daniels to the public. (J.A. 151.) Detective Robson testified that he observed Det. Kimbell "when he was pulling out Daniels' pants, and looking down into the crotch area" and added that Det. Kimbell "pulled [Mr. Daniels' pants] down, lifted them in front, looked down and found the heroin under his scrotum area." (J.A. 181-82 (emphasis added).) Robson's testimony suggests the possibility that Daniels' genital area may have been momentarily exposed. However, even assuming that this occurred, there is no proof that Daniels was exposed to anyone other than Det. Kimbell. The search occurred at night and away from Albemarle Road and a phalanx of male officers surrounded Daniels as he was being searched. These facts indicate that whatever intrusion occurred was limited in scope.

Moreover, employing the totality of the circumstances test established in Bell, we find that the slight risk that Daniels was exposed to the public was far outweighed by various factors supporting the reasonableness and justification for the search. Daniels was arrested and searched at the culmination of a planned take-down for drug distribution--an offense that is commonly associated with the possession of weapons and illegal

12

drugs.  See Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981) (noting the significance, under the Bell inquiry, of whether the relevant offense was "commonly associated by its very nature with the possession of weapons or contraband.").  As a result, the arresting officers' search was justified not only by their suspicion that Daniels was concealing contraband, but also because Daniels presented a legitimate danger to their personal security.  The police initiated the arrest only after Daniels and Corey Edwards had been identified and after much of the information concerning the planned drug transaction provided by the informant Jackson had been corroborated.  During their search of Daniels' person, the officers first searched the outer pockets of Daniels' clothes.  When they initially did not find any weapons or drugs, they then proceeded to look in his underwear, where they found four bundles of heroin.  (J.A. 149-50.)  Also incident to the arrest, the police searched Daniels' Impala, where they found approximately $2,200 in cash and two cell phones.  (J.A. 132, 170.)

In United States v. Dorlouis, 107 F.3d 248 (4th Cir. 1997) the defendant objected to what he called "an unconstitutional strip search" conducted incident to arrest when his pants were removed inside of a police van.  We concluded that the police officers acted reasonably under the circumstances in attempting to find missing money and that the defendant "was not subjected

13

to an unnecessarily intrusive search." Id. at 256. The facts in Dorlouis are sufficiently analogous to the facts in this case, and after weighing all of the circumstances, we affirm the district court's ruling. The search of Daniels' underwear was not gratuitous in light of the officer's reasonable suspicion that illegal contraband was concealed in his pants. There is no clear showing that Daniels was exposed to the public and we find that the police officers acted reasonably under the circumstances.[2]

C.

Among the items seized from Daniels on the night of March 3, 2005, was a key which the officers had reason to believe could access Apartment 106 of 1305 Kelston Place. (J.A. 749.) While Daniels originally consented to the detectives' use of the key to access the residence, he ultimately revoked his consent. (J.A. 173, 749.) Later the officers inserted the key into the door lock of Apartment 106, which was accessible to the public. The officers turned the key to confirm that it operated the lock

---

[2] In support of his argument, Daniels cites Amaechi v. West, 237 F.3d 356, 365 (4th Cir. 2001) where we found a strip search to be "unconstitutionally unreasonable." But the Amaechi case is easily distinguishable in several respects, as it involved a female victim who was subjected to the "public exposure, touching, and penetration of her genitalia and kneading of her buttocks during a search incident to arrest for a misdemeanor noise violation . . . where no security risk or threat of the concealment or destruction of evidence was present." Id. at 362.

14

but did not enter the apartment. (J.A. 136.) Daniels argues that the detectives' conduct in inserting the key into the lock constituted an unreasonable warrantless search in violation of his Fourth Amendment rights.

Our sister circuits are not in accord on whether a defendant has a reasonable expectation of privacy in an external door lock accessible from a public space. The First and Sixth Circuits have ruled that there is no reasonable expectation of privacy in such a lock and that the insertion and turning of a key therein does not constitute a search. See United States v. Salgado, 250 F.3d 438, 456-57 (6th Cir. 2001); United States v. Lyons, 898 F.2d 210, 213 (1st Cir. 1990). The Seventh Circuit, on the other hand, has concluded that there is a reasonable expectation of privacy in a keyhole because a keyhole contains information that is not readily accessible to strangers. United States v. Concepcion, 942 F.2d 1170, 1172 (7th Cir. 1991).

We need not rule on the precise issue of whether the officers' insertion and turning of a key into the door lock of Apartment 106 contravened the Fourth Amendment, because even if we assume that it was a search, it was not unreasonable. The officers' action was a means of identifying the apartment as one to which the defendant had access. The officers employed a legitimate crime investigative procedure that far outweighed whatever minimal intrusion that Daniels may have experienced.

15

In this respect, the act is similar to the use of a narcotic detection dog to "sniff" personal luggage--a non-intrusive procedure that has been deemed constitutional. United States v. Place, 462 U.S. 696, 706-07 (1983). Indeed, we are aware of no precedent that has determined such conduct to be unreasonable, for as the Seventh Circuit observed in Concepcion, "the privacy interest [in a keyhole] is so small that the officers do not need probable cause to inspect it." Id. at 1173. We therefore affirm the district court's finding that Daniels' Fourth Amendment rights were not infringed by the officers' use of a key in the door lock of Apartment 106.

D.

Daniels next argues that the district court erred in refusing to suppress evidence obtained from the execution of a search warrant for Apartment 106 of 1305 Kelston Place. Daniels claims that the government's affidavit supporting the search warrant omitted material information relating to the reliability of the confidential informant, Adrein Jackson. Specifically, the affidavit failed to mention that Jackson had been found engaging in drug trafficking activity on three occasions in the days prior to, and including, the day the search warrant was sought. In addition, it failed to mention that Jackson had attempted to flee from law enforcement on the day of his arrest in March of 2005. Daniels contends that because of these

16

omissions, the supporting affidavit was constitutionally insufficient and that the evidence obtained from the seizure must be excluded under the "fruit of the poisonous tree doctrine." Wong Sun v. United States, 371 U.S. 471, 484 (1963).

The Fourth Amendment states that "no warrants shall issue, but upon probable cause supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. Even upon de novo review, "the determination of probable cause by the issuing magistrate is entitled to great deference" from the reviewing court. United States v. Hodge, 354 F.3d 305, 309 (4th Cir. 2004). Indeed, "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39 (1983) (alterations and internal quotation marks omitted). There is a "strong 'presumption of validity with respect to the affidavit supporting the search warrant.'" United States v. Colkley, 899 F.2d 297, 300 (4th Cir. 1990) (quoting Franks v. Delaware, 438 U.S. 154, 171 (1978)).

By alleging that the supporting affidavit contained deliberately false statements or omissions, Daniels is referencing the exception established in Franks v. Delaware, 438 U.S. 154 (1978) allowing a defendant, "in certain narrowly defined circumstances . . . [to] attack a facially sufficient

17

affidavit." Colkley, 899 F.2d at 300. In Franks, the Supreme Court created a rule of "limited scope" which allows for a Defendant to obtain a hearing in order to challenge a facially sufficient affidavit after making a preliminary showing that "(1) the affidavit in support of the search warrant contained statements or omissions that were deliberately false or demonstrated a reckless disregard for the truth, and (2) that the challenged statements or omissions were essential to the magistrate judge's finding of probable cause." 438 U.S. at 155-56. If a Franks hearing is granted and the affiant's material falsity or recklessness is found by a preponderance of the evidence, the warrant must be voided and the evidence procured must be excluded. Id. at 156.

Daniels has not made the prerequisite showing of intent or recklessness. In Colkley, we emphasized that to establish "intent," a defendant cannot merely claim that information was knowingly or negligently omitted from an affidavit. 899 F.2d at 300-01. Instead, the omissions must be revealed as "designed to mislead, or . . . made in reckless disregard of whether they would mislead, the magistrate." Id. at 301 (emphasis in original). In this case, Daniels has not demonstrated that the affiants, Detectives Robson and Kimbell, had any intent to mislead. Nor will we infer any intent or recklessness from the

18

mere fact of the omission. See id. (refusing to infer bad motive under Franks based upon the fact of an omission alone).

Furthermore, even if Daniels had satisfied the first prong by showing intent, his pursuit of a Franks hearing would have floundered for failure to prove the materiality of the omitted information. To be material, an omission "must do more than potentially affect the probable cause determination: it must be 'necessary to the finding of probable cause.'" Colkley, 899 F.2d at 301 (quoting Franks, 483 U.S. at 156). Therefore, we must determine whether if the information relating to Jackson's arrests had been included in the affidavit, sufficient probable cause would have still existed under the "totality of the circumstances" test established in Illinois v. Gates, 462 U.S. 213 (1983).

Despite the fact of Jackson's ongoing drug trafficking, in October of 2004, he had provided police with reliable information about the drug conspiracy involved in the case, including information implicating Daniels that was ultimately corroborated. In addition, all of the information he gave to detectives on March 3, 2005, that could be corroborated was corroborated, including the arrival of Defendant at the location of the drug deal in a vehicle matching the description he had earlier offered. See United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir. 1993) ("[a]n important factor in determining

19

whether an informant's report establishes probable cause is the degree to which it is corroborated."). Moreover, additional information in the affidavit lent further support for probable cause. The detectives noted that they had linked Apartment 106 to Toria Douglas, who was identified through birth records as the mother of Daniels' baby girl, Semira Douglas, born on August 17, 2004. The detectives also stated in the affidavit that a key seized from Daniels had unlocked the door lock of Apartment 106. Taken as a whole, the information in the affidavit was substantial and detailed and provided a "substantial basis" for probable cause. As the district court observed, "[Jackson was] a bad actor providing reliable information." (J.A. 341.) Therefore, while the omitted reference to Jackson's illegal conduct did relate to his reliability, it was not material in the Franks context--it would not have changed or altered the magistrate's finding. See United States v. Miller, 925 F.2d 695, 699-700 (4th Cir. 1991) (reliability of informant's information may be inferred from factual circumstances, even if affidavit otherwise fails to assert informant's reliability).

Viewing the circumstances as a whole and according the state judge appropriate deference, we affirm the district court ruling on the search warrant application. In doing so, we are mindful of the stringent standard that must be met to convene a

Franks hearing and find that Daniels failed to make the prerequisite "intent" or "materiality" showings.

## III.

Daniels contends that his Fifth and Sixth Amendment rights were violated by the district court's offense level enhancements. The district court applied a four-level enhancement based on defendant's role as leader of the conspiracy and a two-level enhancement based on a finding that Daniels obstructed or attempted to obstruct the administration of justice. We review factual findings made by a district court at sentencing for clear error. See, e.g., United States v. Stewart, 256 F.3d 231, 253 (4th Cir. 2001).

### A.

United States Sentencing Guideline § 3B1.1(a) directs the sentencing court to increase a defendant's offense level by four if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

The district court observed that Daniels exercised a leadership role in a criminal activity that involved five or more participants or was otherwise extensive. (J.A. 1842-43.) This activity included, among other things, Daniels' recruitment of accomplices such as Charles McCombs as an enforcer. Daniels

21

made trips to New York to obtain drugs from a source and he distributed these drugs through Adrian Jackson, William Boyd, Corey Edwards and others in the vicinity of Beatties Ford Road in Charlotte. Although Daniels claims that Raheem Williams was not a part of the conspiracy, the testimony of other witnesses supported his inclusion. Finally, Daniels' girlfriend, Toria Douglas, worked under his supervision and control by packaging drugs and purchasing firearms. Because the record is replete with evidence that Daniels played a leadership role in an extensive conspiracy, the district court did not clearly err in applying the four-level enhancement under § 3B1.1(a).

B.

Section 3C1.1 of the Sentencing Guidelines directs the sentencing court to apply a two-level enhancement to a defendant's offense level where defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of the conviction" and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct or a closely related offense. U.S.S.G. § 3C1.1. The Commentary to § 3C1.1 states that the enhancement should apply to conduct that includes, but is not limited to: "(a) threatening, intimidating, or otherwise unlawfully influencing a codefendant, witness or

22

juror, directly or indirectly, or attempting to do so; (b) committing, suborning; or attempting to suborn perjury . . . ; (c) producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceedings . . . ."

The district court found that Daniels forced William Boyd to write a letter recanting his earlier statements to law enforcement implicating Daniels and Toria Douglas in the distribution of cocaine and heroin. During trial, Boyd testified that Daniels did not verbally threaten to harm him if he refused to write the letter. However, Boyd explained that he was sitting in the recreation yard of the jail when Daniels stood over him and demanded that Boyd write the letter. Boyd stated that he was intimidated by Daniels' physical presence and that he felt that he had no choice other than to comply. Based upon this information in the record, the jury found beyond a reasonable doubt that Defendant had intimidated Boyd through this conduct. We likewise conclude that the district court did not err in applying the two-level enhancement under § 3C1.1.

IV.

In Count One of the Superseding Indictment, Daniels was charged with conspiracy to possess with intent to distribute heroin and cocaine in violation of 21 U.S.C. §§ 841(a) and 846.

23

In its jury instructions, the district court outlined the elements required to convict Daniels under the conspiracy charge as well as under the substantive allegations of possession with intent to distribute contained in Counts Five and Six. (J.A. 1708-1731.) However, the court failed to deliver a supplemental instruction relating to the penalty subsection of 21 U.S.C. § 841(b) regarding the drug amount attributable to individual defendants in the alleged conspiracy. Subsection 841(b) presents a graduated penalty scheme establishing three different sets of statutory minimum and maximum sentences for drug distribution offenses based upon drug quantity. See § 841(b)(1)(A), (B), (C).

Daniels contends that the district court erred in failing to expressly instruct the jury that it needed to make a finding as to the drug quantity specifically applicable to him in accordance with Pinkerton v. United States, 328 U.S. 640 (1946). He notes Fourth Circuit precedent holding that such an error infringes a defendant's Sixth Amendment right to trial by jury. See United States v. Collins, 415 F.3d 304, 313-14 (4th Cir. 2005) (vacating defendant's sentence and remanding because of district court's failure to properly instruct jury on how to determine drug amounts); United States v. Ferguson, 245 Fed. Appx. 233, 237 (4th Cir. 2007) (same); United States v. Irvin, 2 F.3d 72, 78 (4th Cir. 1993) (mandating that sentencing court

24

consider the quantity of narcotics attributable to each co-conspirator by relying on the principles set forth in Pinkerton).

The Government contends that when considered together, the district court's jury instructions and the language in the special verdict form comply with the mandate propounded in Collins and that Daniels' Sixth Amendment rights were not violated.

Normally, the issue of whether the district court properly instructed the jury on the law is reviewed de novo. United States v. Thompson, 421 F.3d 278 (4th Cir. 2005). However, because Daniels failed to object to the adequacy of the drug quantity instruction at the time it was given, we review for plain error. United States v. Foster, 507 F.3d 233, 249 (4th Cir. 2007) (citing United States v. Olano, 507 U.S. 725, 732 (1993)). Under Federal Rule of Criminal Procedure 52(b), a court of appeals may correct a district court upon identification of an "error" that is "plain" and that "seriously affect[s] substantial rights." In addition, an appellate court's reversal under plain error review is incumbent upon a finding that the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Olano, 507 U.S. at 732 (quoting United States v. Young, 470 U.S. 1, 15 (1985)).

Both the government and Daniels agree that our analysis must be guided by the parameters established in United States v. Collins, 415 F.3d 304 (4th Cir. 2005). Collins involved a similar situation in which a defendant challenged his conviction under 21 U.S.C. §§ 841(a) and 846, citing the district judge's failure to instruct the jury to apply Pinkerton principles in determining the drug quantity for the penalty purposes of § 841(b).[3] This Court held that the threshold drug quantities for penalty purposes under § 841(b) must be determined by a jury beyond a reasonable doubt.[4] Furthermore, we held that a district court must instruct a jury that in establishing the threshold drug quantities, it must, pursuant to Pinkerton, determine the quantity attributable to each co-conspirator--that is, the

---

[3] In Pinkerton v. United States, 328 U.S. 640 (1946), the Supreme Court held that in a criminal conspiracy case, a defendant can only be held liable for conduct that is within the scope of the criminal agreement and reasonably foreseeable as a natural consequence of the agreement.

[4] The progression of our analysis was summarized in United States v. Brooks, 524 F.3d 549, 557-61 (4th Cir. 2008). We first held in United States v. Irvin, 2 F.3d 72, 77 (4th Cir. 1993) that a trial court must determine by a preponderance of the evidence the drug quantity attributable to a particular defendant. We were then guided by the Supreme Court's conclusion in Apprendi v. New Jersey that "any fact that increases the penalty . . . beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). Accordingly, in United States v. Promise, 255 F.3d 150, 156 (4th Cir. 2001) (en banc), cert. denied, 535 U.S. 109, 122 S. Ct. 2296, 152 L. Ed. 2d 1053 (May 28, 2002), we held that a jury must determine the drug quantity to establish a defendant's statutory sentencing range under 21 U.S.C. § 841(b).

26

amount that was in furtherance of the conspiracy and reasonably foreseeable to each defendant as opposed to the conspiracy as a whole. Collins, 415 F.3d at 314 (citing United States v. Irvin, 2 F.3d 72 (4th Cir. 1993)).

At the close of Daniels' trial the jury was instructed that a conspirator "is responsible for offenses committed by another co-conspirator if the conspirator was a member of the conspiracy when the offense was committed, and if the offense was committed in furtherance of, or as a foreseeable consequence of, the conspiracy." (J.A. 1717.) This satisfactorily references Pinkerton principles as to the general conspiracy offense under § 846. However, an equivalent supplemental instruction was not provided as to the sentencing provision in § 841(b) that addresses drug quantity. The only instruction given to the jury relating to drug quantity reads:

> Your decision regarding the quantity and type of substance must be unanimous as to each substance and each amount. You will be provided with a special verdict form that specifically addresses the drug and quantity to be considered. (J.A. 1715.)

The Government argues that the special verdict form supplemented and compensated for omissions in the jury instruction. That special verdict form asks the jury to determine whether defendant was guilty of the substantive conspiracy offense and then asks whether "one kilogram or more of a mixture and substance containing a detectable amount of

27

heroin was reasonably foreseeable" to Defendant and whether "500 grams or more of a mixture and substance containing a detectable amount of cocaine reasonably foreseeable" to Defendant. (J.A. 1762.) After oral argument, the Government noted an unpublished opinion by another panel of this Court in United States v. Howard, No. 07-4146, 2009 U.S. App. LEXIS 1716 (4th Cir. Jan. 29, 2009).[5] In that case, this Court addressed a case involving three defendants in which the evidence that the overall drug quantity was attributable to each of the three defendants was "overwhelming and essentially uncontroverted" and it was found that the Collins requirement was satisfied by a special verdict form. Howard, 2009 U.S. App. LEXIS 1716, at *11-15. Unpublished opinions are not binding precedent in this Circuit, and we decline to hold that Collins error can be corrected by a special verdict form. Furthermore, the facts in Howard are distinguishable from the facts in this case. Defendant Daniels was one of eight defendants charged in a thirteen-count Third Superseding Indictment charging conspiracy in the possession and distribution of both heroin and cocaine. The evidence in this case as to the respective amounts of these two drugs attributable to the numerous defendants was not overwhelming and uncontroverted. A careful application of the principles

---

[5] Supplemental submissions were filed by the Government and Daniels pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure.

established in Collins and reiterated in Brooks was manifestly important. The complexity of the evidence in this case compelled a jury instruction satisfying the principles of Collins and omissions in that jury instruction were not alleviated by the special verdict form.

In Collins, we stated that "for purposes of setting a specific threshold drug quantity under § 841(b), the jury must determine what amount of [drugs] was attributable to [defendant] using Pinkerton principles." 415 F.3d at 314. The special verdict form submitted to the jury superficially refers to the Pinkerton principles when it asks the jury if certain quantities of drugs were "reasonably foreseeable to Daniels." However, we find that the jury in this case was not sufficiently instructed on the factors necessary to make an informed determination of the threshold drug quantity under § 841(b). For instance, under Pinkerton, the jury must determine not only the quantity of drugs "reasonably foreseeable" to Daniels, but also that the drugs were distributed "in furtherance of the conspiracy." In addition, the jury must be instructed to determine the amount of drugs "attributable" to the individual defendant as a co-conspirator, as opposed to the quantity of drugs distributed by the entire conspiracy. At no point, in either the instructions or the special verdict form, was the jury instructed to assess

29

the amount of drugs "attributable" to Daniels alone, rather than to the conspiracy in its entirety.

The importance of explicitly instructing a jury under Collins is poignantly revealed by the circumstances in this case. The jury's decisions on whether or not one kilogram of heroin and 500 grams of cocaine were attributable to Daniels under § 841(b) determined whether or not Daniels faced a mandatory life sentence under Count One. This underscores the need for an individualized sentence due to the significant liberty interest at stake. To protect the need for an individualized sentence, juries must be thoroughly and explicitly instructed; courts cannot assume that the complex issues relating to Pinkerton and drug quantity are obvious or self-explanatory. In light of these concerns, we conclude that Collins' weighty mandate may not be satisfied by an isolated and perfunctory reference in a special verdict form.

The jury was not sufficiently informed in accordance with Collins. This infringed Daniels' Sixth Amendment rights and constituted plain error under the Olano analysis. In addition, Daniels' mandatory life sentence on the conspiracy count is more punitive than the statutory default sentence under § 841(b)(1)(B),[6] which provides for a sentencing range of ten years

---

[6] Daniels has at least one prior drug conviction that was noticed by the government which raises the statutory maximum

to life.  Because a life sentence is not lightly imposed, we find that Daniels' substantial rights were affected.

Having found that the three threshold prerequisites of plain error review have been satisfied, we turn to the question of whether to exercise our discretion under Rule 52(b) to notice the forfeited error.  The Supreme Court has held that an appellate court's discretion is appropriately exercised only when the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  Olano, 507 U.S. at 736 (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)).  The Government argues that we should decline to notice the error because "the overwhelming and essentially uncontroverted evidence supported the conclusion that Defendant was responsible for more than 1,000 grams of heroin and 500 grams of crack cocaine."  (Appellee Br. 32 (citing Foster, 507 F.2d at 252; United States v. Cotton, 535 U.S. 625, 633 (2002)).)

In United States v. Cotton, the Supreme Court found a Sixth Amendment error when the government failed to allege drug quantity in an indictment under § 846 consistent with the principles set forth in Apprendi v. New Jersey, 530 U.S. 466 (1990).  See Cotton, 535 U.S. at 631-32.  However, the Court

---

sentencing range contained in § 841(b)(1)(B) to between ten years and life in prison.

31

declined to notice the infringement on plain error review in light of the "overwhelming" and "essentially uncontroverted" evidence that supported the district court's drug quantity determination.  Id. at 633.  The Cotton precedent has recently been applied in United States v. Foster, a case involving a challenge to jury instructions for failing to cite Pinkerton principles for drug conspiracy charges.  See 507 F.3d at 252.  In Foster, the Collins error was avoided due to "overwhelming and essentially uncontroverted" evidence in the record of defendant's responsibility for an amount in excess of 50 grams of crack.  507 F. 3d at 250-51.  The government established that Foster was a major distributer of crack in Lexington Terrace neighborhood of Baltimore City, "where perhaps over fifty grams of crack were sold on a daily basis, to continue for a substantial period of time."  Id. at 252.  The court noted that "[u]nquestionably, if the jury was properly instructed per Collins, the government's overwhelming evidence of the substantial quantities of crack reasonably foreseeable to Foster would have set the maximum sentence at life imprisonment. . . ."[7] Id. at 252.

---

[7]    In United States v. Davis, a Collins error was not noticed under harmless error review for several co-conspirators because of overwhelming evidence of their responsibility for amounts in excess of 50 grams of crack.  270 Fed. Appx. 236 (4th Cir. 2008).  The court concluded that no rational jury could attribute less than 50 grams of crack to each defendant.  The

At the outset of our analysis, we observe significant factual differences between Foster and the present case. First, Count One of the Superseding Indictment filed in this case establishes a much higher threshold for conviction both in terms of the number and quantity of drugs alleged. Instead of the threshold of 50 grams of cocaine alleged in Foster, Daniels is charged with conspiracy to distribute 1,000 grams or more of heroin and 500 grams or more of cocaine. Therefore, we must appraise the amount of evidence on drug quantity attributable to Daniels and how it corresponds with the relatively high threshold alleged for each separate drug.

We find that there is overwhelming and uncontroverted evidence that over 500 grams of cocaine was attributable to Daniels. Evidence was submitted regarding the search of Apartment 106 of 1305 Kelston Place, a residence which Daniels had access to and control over. Several police officers and forensic chemists testified in detail about the various items obtained from the search, including the seizure of more than 500 grams of cocaine.[8] The record therefore contains solid and essentially unassailable evidence, both physical and

court noted that "[t]he evidence at trial showed that, even by conservative estimates, most [Defendants] were responsible for many thousands or tens of thousands of grams of crack." Id. at 254-55 (emphasis in original).

[8] The Presentence Investigation Report ("PSR") determined that a total of 1,097 grams of cocaine was seized from the apartment at 1305 Kelston Place. (J.A. 1882.)

testimonial, indicating that more than the threshold quantity of cocaine alleged in the conspiracy charge was directly attributable to Daniels.

However, we do not find equally compelling evidence that the quantity of heroin attributable to Daniels surpassed the 1,000 gram threshold alleged in the conspiracy charge. The most convincing evidence confirming Daniels' responsibility for heroin was in the form of the over 200 grams of heroin seized from the 1305 Kelston Place residence[9] and the 8 grams of heroin seized from Daniels' person when he was arrested in the parking lot of the Bi-Lo grocery store. The remaining trial evidence concerning Daniels' ties to heroin was in the form of testimony from co-conspirators, most of whom did not testify as to specific quantities of heroin expressed in grams. In addition, the credibility of these co-conspirators was heavily contested on cross-examination, meaning that a jury could ascribe correspondingly less weight to their statements. For instance, in order to reach the one kilogram threshold for heroin, the jury would have to rely heavily upon the testimony of co-conspirator Charles McCombs, when he stated that he traveled with Daniels to New York on three occasions in the beginning of 2005 to purchase what he estimated to be 300 grams of heroin at

_____

[9] The PSR determined that a total of 245.5 grams of heroin was seized from the apartment at 1305 Kelston Place. (J.A. 1882)).

34

a time.  (J.A. at 1394-95, 1400-05.)  However, not only was this testimony uncorroborated, but McCombs admitted on recross-examination that he never weighed the heroin or witnessed it being weighed.  (J.A. 1499-1501.)

Considered together, the evidence revealing Daniels' responsibility for 1,000 grams of heroin is neither overwhelming nor uncontroverted.  Although there is solid evidence concerning the combined seizure of up to 250 grams of heroin from Daniels' person and from the apartment at 1305 Kelston Place, much of the remaining testimonial evidence pertaining to heroin was anecdotal, uncorroborated and contested on cross-examination. Even if the jury had determined that one kilogram of heroin was involved in the conspiracy (the quantity assessed in the PSR), it is possible that a properly instructed jury could have rationally attributed a lesser quantity to Daniels.  See United States v. David, 83 F.3d 638, 648 (4th Cir. 1996) (noticing plain error for failure to instruct on an element of a crime upon a determination that "a jury could conceivably have concluded . . . that [the omitted element] was not ultimately proven").  Therefore we conclude that a jury could conceivably have found that less than 1,000 grams of heroin was attributable to Daniels.  The disparity between the evidence of quantity attributable to Daniels and the amount charged is far less dramatic than was manifested in Foster.  A contrary ruling would

not comport with a common sense interpretation of the "overwhelming and essentially uncontroverted evidence" standard that serves to protect the fairness, integrity and reputation of the judicial process.

Having determined it appropriate to exercise our discretion under Rule 52(b), we are again directed by <u>Collins</u> in prescribing the appropriate remedy. We vacate and remand to the district court while withholding judgment on the conspiracy count for thirty days.[10] The Government may elect to apply the relevant default penalty provision in § 841(b)(1)(B) (providing for a sentence of ten years to life in prison), or the Government may request that the conspiracy conviction be reversed and institute a new trial. See <u>Collins</u>, 415 F.3d at 315.

<u>AFFIRMED IN PART,</u>
<u>VACATED IN PART,</u>
<u>AND JUDGMENT WITHHELD IN PART</u>

---

[10] Although Daniels' sentence was improper, his conviction under Count One for conspiracy to distribute heroin and cocaine is legitimate since it does not depend upon a determination as to the amount or type of narcotics at issue. See <u>Collins</u>, 415 F.3d at 314.

DUNCAN, Circuit Judge, dissenting:

I respectfully dissent from part IV of my colleague's opinion and the resulting decision to remand. Collins holds that a jury must determine "the quantity of narcotics attributable to each coconspirator by relying on the principles set forth in Pinkerton." United States v. Collins, 415 F.3d 304, 312. Therefore, by its plain terms, our precedent requires nothing more than a jury determination that a given quantity of drugs was "reasonably foreseeable" to a defendant. To decide otherwise would be to turn our notion of conspiracy, which entails coconspirator liability for reasonably foreseeable acts, on its head. See Pinkerton v. United States, 328 U.S. 640, 647-48 (1946) (noting the "principle" that "the overt act of one partner in crime is attributable to all" where it is "within the scope of the unlawful project"). The notion of attribution in Collins does not require greater proof of individual responsibility for a substantive crime, including an amount of drugs distributed, than does our jurisprudence following Pinkerton. The drugs "attributable" to a defendant are those reasonably foreseeable to him based upon his participation in the conspiracy. See Collins, 415 F.3d at 312 (finding it is the "amount of narcotics *attributable to [an individual defendant]*" and not "the amount of narcotics distributed by the *entire conspiracy*" that is determinant under § 841(b)). Thus, any

37

narcotics that were distributed by the conspiracy but not reasonably foreseeable to an individual defendant--and therefore not, under Pinkerton, properly attributable to him--may not be considered in determining his sentence.

In this case, pursuant to the special verdict form, the jury found that the drug amounts in question were "reasonably foreseeable to Jermal Daniels." J.A. at 1809. This is all that Collins requires. There is no basis in the record to assume that the jury's determination was inadequate. I therefore respectfully dissent from the portion of the court's opinion finding a Collins violation. Because I find no violation, I do not join in the decision to reverse the judgment of the district court and remand on this question.