**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 21-4428**

UNITED STATES OF AMERICA,

> Plaintiff - Appellee,

v.

DAWHAN TERRELL ARCHIBLE, a/k/a Sosa,

> Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News.  David J. Novak, District Judge.  (4:20-cr-00015-DJN-LRL-1)

Submitted:  April 25, 2022                    Decided:  July 26, 2022

Before GREGORY, Chief Judge, DIAZ, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ON BRIEF:**  Maureen Leigh White, Richmond, Virginia, for Appellant.  Jessica D. Aber, United States Attorney, Richmond, Virginia, Lisa R. McKeel, Assistant United States Attorney, Brian J. Samuels, Assistant United States Attorney, Newport News, Virginia, Jacqueline R. Bechara, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case is about a drug deal that resulted in the murder of Mr. Luke Dudley.  Now, on appeal, Defendant, Dawhan Terrell Archible, challenges the sufficiency of the evidence supporting his conviction for two crimes:  use of a firearm resulting in death and conspiracy to distribute cocaine base.  First, because Archible waived his challenge to the drug conspiracy conviction in his Rule 29 motion, we may only reverse if there is a manifest miscarriage of justice.  We do not find that such miscarriage of justice occurred because the jury heard voluminous evidence, including Archible's admissions, that he made an agreement to trade heroin for crack cocaine with his associate, and agreed to exchange that crack cocaine for Percocet with Mr. Dudley.  Second, there is no basis for vacating Archible's conviction for the use of a firearm resulting in Mr. Dudley's death because the jury heard ample evidence supporting this conviction as well, including Archible's admissions.  Thus, the district court's judgment is affirmed.

I.

On January 15, 2017, the Newport News Police Department received a call about a burglary taking place at 3005 Madison Avenue—a boarding house and Mr. Dudley's residence.  When police arrived, both the front door and an upstairs bedroom door had been forced open, and Mr. Dudley was deceased on the floor with multiple gunshot wounds.  Detectives also found bullet fragments and blood in the main entrance and on the door handle to an upstairs bedroom.  Through information obtained from confidential sources and cooperating witnesses, detectives determined that Archible, a five-star Nine-Trey

2

Blood Nation gang member, and two unindicted coconspirators ("UNC 1 and 2") were involved in the murder. Later, the detectives determined that the DNA from the blood found on the scene matched Archible.

At trial, the jury heard evidence showing that, on January 15, 2017 at around 6:00 A.M., Archible; and UNC 1, Keandre Ricks ("Dre" or "Ricks"), a three-star Blood gang member; and UNC 2, Delvon Nicholson ("Von" or "Nicholson"), were at Carrie Williams's ("C.W.") residence. At this time, Mr. Dudley approached Marquis Jones ("Jones" or "Snooks"), who was outside C.W.'s residence. Mr. Dudley wanted to trade Percocet for crack cocaine. Jones then went inside to inform Archible of the trade. Though Archible was interested in the trade, he only had heroin. So, Archible traded Ricks about 3 grams of heroin for about 3.5 grams of crack cocaine, worth about $200. J.A. 663. Archible then provided Mr. Dudley with the crack cocaine in exchange for "30-milligram (mg) Percocets." J.A. 1094. However, Mr. Dudley did not have the Percocets on hand. So, Mr. Dudley suggested that Archible accompany him to go back to Mr. Dudley's residence to retrieve the Percocets. Archible agreed and went to Mr. Dudley's residence—a few blocks away from C.W.'s residence—to retrieve the Percocets.

When Archible returned to C.W.'s residence, Jones informed Archible that Mr. Dudley had given him "sugar rather than Percocets." J.A. 1094 (Presentence Report "PSR" at ¶ 12). In response, Archible told Ricks to "'grab the junk,' 'grab the pole,'" referencing a gun, and instructed Ricks and Nicholson to accompany him to walk to Mr. Dudley's residence to get the Percocets that they were owed. *Id.* When they arrived, Mr. Dudley did not answer the door. So, Archible forced open the door with a knife and cut himself in

3

the process. Archible and Ricks entered the house, and Archible instructed Nicholson to be the lookout outside. After they entered, Mr. Dudley opened his room door, and, according to Archible, "it was apparent that [Mr. Dudley] had smoked a substantial amount of the crack cocaine." J.A. 1094 (PSR at ¶ 13). Then, Ricks hit Mr. Dudley in the head with the gun and Archible questioned Mr. Dudley about the location of the Percocets. Mr. Dudley screamed, was struck again, and then explained that "the drugs were in an upstairs bedroom," a room that "had a padlock and [that Archible] kicked [] in." *Id.* As Ricks held Mr. Dudley at gunpoint, Archible instructed Mr. Dudley to find the drugs but when he was "unable to locate the Percocets, he was struck in the face." J.A. 1094 (PSR at ¶ 14). Then, Archible "took possession of the firearm" and held it on Mr. Dudley and "ordered [Ricks] to look for the drugs." *Id.* Ultimately, neither Ricks nor Archible found the Percocets, and Mr. Dudley was shot and killed. After the shooting, Archible, Ricks, and Nicholson returned to C.W.'s residence, where Archible "told C.W. to get him a black trash bag," and Archible "proceeded to remove his coveralls and place them in the trash bag." J.A. 1095 (PSR at ¶ 15). Archible told C.W. to stay quiet, and Archible left town sometime after the incident.

On April 12, 2017, Archible was convicted on other state offenses and his supervised release, for a previous federal sentence, was revoked. On October 19, 2017, while serving his federal sentence, he was interviewed by Special Agent Anthony Ambrose, from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and Detective Ryan Norris. During the interview, Archible voluntarily described the events of January 15, 2017, and he admitted that he agreed to the drug deal with Mr. Dudley, that Ricks killed

4

Mr. Dudley over the Percocets, that Archible gave Ricks the firearm used to kill Mr. Dudley, and that he instructed Nicholson to get rid of the gun. *See* J.A. 882–96.

On October 8, 2020, Archible was named in a five-count Superseding Indictment filed in the Eastern District of Virginia, Newport News Division charging him with: Use of Firearm Resulting in Death, in violation of 18 U.S.C. § 924(c)(1), (j) and (2) (Count One); Conspiracy to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a) (Count Two); Attempt to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951(a) and (2) (Count Three); Drug Conspiracy, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846 (Count Four); Distribution of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Count Five).

On March 17, 2021, and at the end of a five-day trial, Archible moved for a directed verdict of acquittal on Count One, which the district court denied. J.A. 694. Subsequently, the jury found him guilty of all five counts. On June 8, 2021, Archible again filed a motion to set aside the verdict, which the court denied on July 28, 2021. On August 10, 2021, the district court sentenced Archible to life in prison on Count One to run consecutively to all other terms of imprisonment and sentenced him to 240 months, to be severed concurrently, on Counts Two through Five. J.A. 1079–86. Archible filed a timely appeal to this court and raises two arguments which we examine below.

## II.

First, Archible argues that the government did not present sufficient evidence showing that Archible and his alleged co-conspirators jointly engaged in, or conspired to

5

engage in, the distribution of cocaine base either before or after the single spontaneous exchange of crack for Percocet with Mr. Dudley. *See* Opening Br. at 2.

A.

As an initial matter, Archible argues that we should review this issue *de novo* because, "[a]lthough trial counsel did not [m]ove for a Rule 29 Judgment of Acquittal on Count 4, he did so on Count 1." Opening Br. at 18. We disagree.

A "waiver is the intentional relinquishment or abandonment of a known right." *Wood v. Milyard*, 566 U.S. 463, 474 (2012) (internal quotation marks omitted). In his Rule 29 Motion, Archible did not raise the argument that he now raises on appeal. Rather, Archible raised a Rule 29 motion as to Count One alleging that there was insufficient evidence that Archible was the one who killed Mr. Dudley, and that the drug conspiracy had ended by the time that Mr. Dudley was killed. Accordingly, Archible argued that Count Four "could not be used as a predicate for the Use of a Firearm Resulting in Death." J.A. 924. Moreover, Archible argued that "[he] is a drug dealer who sells heroin and not crack [and] [t]he evidence shows that [Jones] introduced Dudley to [him] for the purpose of conducting a single, discreet crack transaction." J.A. 926. Thus, as to Count One, Archible argued that Mr. Dudley was not killed during the commission of Count Four because by the time Archible arrived at Mr. Dudley's house to retrieve the Percocet, the "sole goal of the conspiracy [was] over." J.A. 927.

On appeal, Archible concedes that his trial counsel did not specifically raise a sufficiency of the evidence challenge for his Count 4 conviction for drug conspiracy. Opening Br. at 17–18. Rather, Archible argues that because his Rule 29 motion alleged

6

that the government did not prove that he committed a drug trafficking crime (as charged in Count Four) as a requisite element for Count One, that this was sufficient to place the district court on notice that he was also challenging the sufficiency of the evidence for the alleged offense conduct for Count Four. *Id.* This is incorrect because the record shows that Archible only challenged the sufficiency of the evidence on Count One.

Indeed, at trial, the district court mentioned to defense counsel that "you've basically admitted he's guilty of the drug offenses," J.A. 592 (Trial Tr. 565: 5–7), and defense counsel did not refute this statement. Even more, defense counsel admitted in closing to the jury that Archible "is guilty on Counts Four and Five. You don't need to concern yourselves with those counts. He's guilty. It's One, Two and Three that are important, and that is where the dispute lies." J.A. 784 (Trial Tr. 757: 10–13).

### B.

"[W]hen a defendant raises specific grounds in a Rule 29 motion, grounds that are not specifically raised are waived on appeal," unless "a manifest miscarriage of justice has occurred." *United States v. Chong Lam*, 677 F.3d 190, 200 & n.10 (4th Cir. 2012) (internal quotation marks omitted); *see also United States v. Duroseau*, 26 F.4th 674, 678 (4th Cir. 2022). No such miscarriage of justice occurred here because the jury heard voluminous evidence of Archible's agreement to trade heroin for crack cocaine with his associate, and his agreement to exchange that crack cocaine for Percocet.

To convict Archible of conspiracy to distribute cocaine base, the government must prove each of the following elements beyond a reasonable doubt: (1) there was an agreement between two or more persons to possess with intent to distribute crack cocaine;

7

(2) Archible knew of this agreement, or conspiracy; and (3) Archible knowingly and voluntarily participated in or became a part of this agreement or conspiracy. *United States v. Strickland*, 245 F.3d 368, 384–85 (4th Cir. 2001); *United States v. Burgos*, 94 F.3d 849, 857 (4th Cir. 1996) (en banc).[1]

On appeal, Archible argues that "evidence of the conspiracy to distribute cocaine was based on a single transaction which was entirely spontaneous in nature." Opening Br. at 18. Furthermore, Archible asserts that the "government presented no evidence that, prior to Mr. Dudley's unfortunate appearance at the Williams residence, the actors had ever even considered selling crack as a joint endeavor, or whether they had in fact done so." Opening Br. at 20. Both at trial and on appeal, Archible argues that, on January 15, 2017, it was "by happenstance" that Mr. Dudley came by C.W.'s residence to trade Percocets for crack cocaine. *Id.* Also, Archible maintains that he did not sell the crack cocaine but, rather, his intention was to trade the crack for the Percocets, for personal use, and to share with Ricks and Nicholson. J.A. 633–59 (Archible stating at trial that he "was going to give Percs to [Ricks, Jones, and Nicholson] . . . because all of us drink lean[2] and pop Percocets"). Archible also argues that neither Ricks, Jones, nor Nicholson had complete knowledge of

---

[1] During the trial, the district court instructed the jury that to convict Archible of Count Four the government needs to prove that (1) two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common unlawful plan, as charged in Counts Two and Four of the amended indictment; and (2) that the defendant became a member of such conspiracy. J.A. 727 (Trial Tr. at 739: 17–23).

[2] "Lean" is an illicit substance "made by combining a codeine-based cough syrup with soda," J.A. 1113, and Percocet pills are also used in the drink. At trial, Archible admitted to "drink[ing] lean and us[ing] Percs." J.A. 633.

8

the conspiracy because they did not know what Archible was going to do with the Percocets. In all, Archible argues that no conspiracy existed because it was spontaneous and "its goal was not the distribution of crack but rather the acquisition of Percocet." Opening Br. at 22.

To be sure, evidence only showing a single buy-sell drug transaction "on its own is too thin to support an inference of conspiracy." *United States v. Allen*, 716 F.3d 98, 103 (4th Cir. 2013) (citing *United States v. Edmonds*, 679 F.3d 169, 174 (4th Cir. 2012), *judgment vacated on other grounds*, 568 U.S. 803 (2012)). Nevertheless, "evidence of a buy-sell transaction is at least relevant (i.e., probative) on the issue of whether a conspiratorial relationship exists." *United States v. Mills*, 995 F.2d 480, 485 n.1 (4th Cir. 1993). To rise to the level of conspiracy, "evidence of a buy-sell transaction, when coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were coconspirators." *Id.* Evidence of a defendant buying or selling a substantial quantity of drugs over a short period of time is enough to raise an inference of a distribution conspiracy. *United States v. Reid*, 523 F.3d 310, 317 (4th Cir. 2008). Though a defendant need not know all the details of a conspiracy, he must know the essential object of the conspiracy and the "agreement need only be a tacit or mutual understanding between the defendant and his accomplice." *United States v. Hackley*, 662 F.3d 671, 679 (4th Cir. 2011). Conspiracy may also be inferred by circumstantial "evidence of an agreement" which includes examining the defendant's "relationship with other members of the conspiracy, the length of this association, his attitude, conduct, and the nature of the conspiracy." *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir. 1984) (internal

9

quotation marks omitted); *see also United States v. Moody*, 2 F.4th 180, 195 (4th Cir. 2021).

Here, the jury heard ample evidence that Archible, and his co-conspirators, had a long-standing, pre-existing relationship as drug dealers and that they dealt drugs from C.W.'s house where Mr. Dudley came by to trade his Percocet for crack. *See Hackley*, 662 F.3d at 680 (concluding that the "evidence of continuing relationships and repeated transactions" was "sufficient to support an inference of an ongoing relationship" between the defendant and the drug suppliers (internal quotation marks omitted)). Archible also admitted that he, Ricks, and Nicholson used C.W.'s house as a "trap" house in Newport News. *See* J.A. 875–80 (Archible admitting in an interview with ATF Agent Ambrose that C.W.'s house was a "trap" where he had his "drug op"); *see also* J.A. 804 (Trial Tr. 777: 1–4) (the government noting during closing that witnesses referred to C.W.'s address as a trap house where Archible and his co-conspirators sold drugs). During trial, Archible also admitted that, in January 2017, he was selling large quantities of heroin, often had it with him, traveled from Virginia to North Carolina to transport heroin, and made his living solely by selling drugs. *See* J.A. 656–64. Therefore, it was reasonable for the jury to infer that Archible and his co-conspirators, Ricks and Nicholson, had established relationships as drug dealers who sold large quantities of crack cocaine, heroin, and marijuana. Indeed, Archible's own defense counsel admitted that he was guilty of Count Four given the evidence at trial. J.A. 784.

The jury also heard ample evidence that Archible entered into an agreement with Ricks, Jones, Nicholson, and Mr. Dudley to exchange crack cocaine for Percocets. At trial,

Archible admitted that on the morning Mr. Dudley came by to trade his Percocet, he "had a lot" of heroin at the trap house, J.A. 657, and went outside to make a deal with Mr. Dudley, J.A. 633–34. Archible specifically admitted that he made an agreement to trade a bundle of heroin to Nicholson for about $200 worth of crack cocaine, *see* J.A. 657–63, that Archible would trade the crack cocaine for Percocets, *see* J.A. 658, and that Nicholson, Jones, and Ricks would all receive a share of the Percocets because they were all involved in the deal, *see* J.A. 659–60.

Therefore, the jury heard substantial evidence showing that Archible entered into an agreement with Jones, Ricks, and Nicholson to distribute crack cocaine in exchange for the Percocets. *See, e.g.*, *United States v. Wilson*, 484 F.3d 267, 283 (4th Cir. 2007) (concluding there was sufficient evidence that the defendant "entered into an agreement to distribute narcotics" based on a conversation between the defendant and his codefendant discussing the money they were about to make "[c]harging nine hundred for these ounces" (emphasis omitted)); *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994) (concluding that where the defendant "ran drug-related errands" and collected drug money for his coconspirator, there was sufficient evidence to establish the defendant's knowing participation in the conspiracy).

## III.

Second, Archible alleges that the district court erred in denying his motion for a directed verdict of acquittal on Count One. We review the district court's denial of Archible's Rule 29 motion *de novo*. *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005).

11

To establish § 924(c)(1) and (j) violations, the government was required to prove at trial that Archible (1) "committed the predicate drug conspiracy offense"; (2) "used the firearm during and in relation to the drug conspiracy offense"; and (3) "in the course of using that firearm, [Archible] caused the murder" of Mr. Dudley. *United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007). The Supreme Court has clarified that to satisfy the "in relation to" requirement, the government must prove that the firearm has "some purpose or effect with respect to the drug trafficking crime[.] . . . [T]he gun at least must facilitate or have the potential of facilitating, the drug trafficking offense." *Smith v. United States*, 508 U.S. 223, 237(1993) (internal quotation marks and citation omitted). We have also explained that the "in relation to" requirement is satisfied by proof that the "[t]he gun at least [] facilitate[d] or [must] have [had] the potential of facilitating the drug trafficking offense." *United States v. Lipford*, 203 F.3d 259, 266 (4th Cir. 2000) (internal quotations and citations omitted). Alternatively, "[a] defendant can be convicted for aiding and abetting a § 924(j) violation." *United States v. Bran*, 776 F.3d 276, 280 (4th Cir. 2015).

To find Archible guilty of Count One on the theory of aiding and abetting, the government was required to prove that he "knowingly associated himself with and participated in the criminal venture, which require[d] evidence that he shared in [Ricks'] criminal intent." *United States v. Williams*, 342 F.3d 350, 357 (4th Cir. 2003) (internal quotation marks omitted). However, "[p]articipation in every stage of an illegal venture is not required." *United States v. Arrington*, 719 F.2d 701, 705 (4th Cir. 1983) (internal quotation marks omitted).

12

In reviewing this issue, we must maintain the guilty verdict if, viewing the evidence in the light most favorable to the government, the verdict is supported by "substantial evidence . . . that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Burgos*, 94 F.3d at 862 (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)).  We defer to the jury's credibility findings and its findings of fact "are not susceptible to judicial review." *United States v. Lowe*, 65 F.3d 1137, 1142 (4th Cir. 1995), *cert. denied*, 519 U.S. 807 (1996); *see also United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 1135 (1995) ("The jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe.").

Because Archible contests the sufficiency of the evidence used to prove all three elements of the § 924(c)(1) offense, we review the evidence for each element.

A.

As to the first element, the government relied on Count Four as the valid predicate of the § 924(c)(1) offense. *See United States v. Reid*, 523 F.3d 310, 318 (4th Cir. 2008) (affirming § 924(c)(1) conviction predicated on a drug conspiracy).  As noted above, the jury heard ample evidence to convict Archible on Count Four and, thus, Count Four is a valid predicate offense to satisfy the first element.

13

B.

As to the second element, Archible argues that the drug conspiracy conviction was completed after Mr. Dudley left the trap house and gave Archible the fake Percocets. Therefore, Archible argues that use of the firearm was not "in relation to" or in furtherance of the drug conspiracy offense. This argument does not square with the facts of this case.

We have maintained that "collection of drug monies . . . does constitute part of a *conspiracy* to distribute drugs." *United States v. Locklear*, 24 F.3d 641, 647 (4th Cir. 1994). Moreover, though there was no exchange of money, a trade of drugs for drugs, with a readily assessable market value, qualifies as distribution. Thus, collecting drugs as a form of compensation is akin to collecting money for the drug conspiracy. Here, Archible admitted at trial that after he discovered that Mr. Dudley gave him sugar instead of Percocets, Archible said that "ain' nobody about to play me like this bro. I'm about to get my shit back," J.A. 890–91, and Archible then instructed Ricks to get a gun and Nicholson to accompany them to get the drugs back, J.A. 665–70. Thus, the objective of the drug conspiracy—to obtain Percocets—was incomplete because it was thwarted by Mr. Dudley. Archible specifically instructed Ricks to get the gun to retrieve his crack cocaine and Percocets. *See* J.A. 635 (Archible testifying that he told Ricks "to come with me, we go down here and get the crack back for the Percs" and that Nicholson heard this as well.).

When they arrived at Mr. Dudley's residence, Archible saw that Mr. Dudley had smoked the crack cocaine, *see* J.A. 673, and, so, Archible instructed Ricks to search Mr. Dudley's room for the Percocets while Archible pointed a gun at Mr. Dudley, *see* J.A. 674–76. The gun was used multiple times by Ricks and Archible to hit Mr. Dudley,

14

threaten him by pointing the gun against Mr. Dudley, and pressure him into giving Archible the Percocets—the agreed form of payment for the drug deal.  Then, when Ricks found an empty pill bottle, Archible became upset because Mr. Dudley was "playing games," J.A. 678, and, so, according to one version of events, Archible handed Ricks the gun and turned away, while Mr. Dudley was shot multiple times, J.A. 679–80.  Therefore, the evidence shows that the drug conspiracy was incomplete because Archible received fake Percocets and, so, Archible and Ricks used the gun to collect the debt that Mr. Dudley owed him— the real Percocets.

C.

As for the third element, Archible argues that there was not substantial evidence showing that he used the firearm that caused the death of Mr. Dudley.  *See* Opening Br. at 27–28.  Here, the jury heard three versions of what happened—any of which could reasonably serve as the basis for convicting Archible.

1.

The first version of events is that Archible pulled the trigger.  To support this theory, the government proffered the testimony of George Holley—a paid informant who spent time with Archible in the trap houses, observed Archible sell drugs, and ran into Archible shortly after Mr. Dudley was killed.  J.A. 377–87.  At trial, Holley testified that while he was with Archible at C.W.'s house after the shooting, Archible said that Mr. Dudley "played him" and, so, he and Ricks returned to Mr. Dudley's house, "kicked the door in, went in there, started rambling through the house, rambl[ed] through the main dresser drawers, [and asked] [Mr. Dudley] where the crack at or where the Percs at."  J.A. 407

15

(Trial Tr. 380: 2–12). Then, according to Holley, "[Archible] said out of his mouth that he pulled the gun out, shot [Mr. Dudley] so many times and then [Ricks] shot him so many times." J.A. 407 (Trial Tr. 380: 19–21). Holley noted that Nicholson was present when Archible said this and that he did not correct Archible. Holley also testified that when he ran into Archible on the day of the shooting, Archible pointed to where Mr. Dudley lived where there were many police vehicles and then told Holley "that was his work," J.A. 397–98. Archible also asked Holley "to go down there and check the scene out." J.A. 398. Holley further testified that, on the day of the killing, Archible cut off the dreadlocks he was wearing the day before. J.A. 403. Archible would later tell police that he cut off his dreadlocks to avoid police detection. J.A. 911–12.

Later, on January 20, 2017, Holley made a recorded call to Archible where they discussed Mr. Dudley's murder. In that call, Archible said that "only two of us been smart and went out of town." J.A. 861. Archible also said that he had only informed his gang "affiliated hommies" about Mr. Dudley's murder and that he was not going around telling everybody what happened because he knew what would happen if he did. *Id.*

On rebuttal, Archible denied that he saw Holley on the day of the murder, before and after. J.A. 684. However, Archible agreed that Holley truthfully testified about Archible breaking into Mr. Dudley's residence and cutting off his own hair after the murder. J.A. 685–86. Archible also testified that he gave the firearm to Nicholson, to get rid of it. J.A. 687. In all, Archible testified at trial that Holley's testimony was largely true, except the part about Archible being the shooter, as Archible maintained that it was Ricks who killed Mr. Dudley. J.A. 688.

16

Still, Archible did not overcome the forensic evidence showing that there were ten 9-millimeter Lugar cartridge cases and three bullets where Mr. Dudley was found, J.A. 187–94, 268–69, and that the DNA found on six swabs of blood collected from the scene matched Archible's DNA. J.A. 518–20, 522. Archible admitted that he owned the 9-millimeter Lugar used to kill Mr. Dudley, J.A. 898–903, and admitted that he cut himself on the front door when he forced it in. J.A. 910. The government also provided circumstantial evidence by C.W. that, on the morning of Mr. Dudley's death, Archible returned to her house and asked her if he could use the bathroom, asked for some bleach, J.A. 364, and she heard him "putting something in a bag," J.A. 365–66. Then, Archible left with a bag and told C.W. "if anybody come for me, you don't know nothing. You didn't see anything." J.A. 367.

## 2.

The second version of events is that Archible ordered Ricks to kill Mr. Dudley. In a conversation between Archible and Agent Ambrose, Archible admitted that he ordered Ricks to kill Mr. Dudley. *See* J.A. 895 ("I gave [Ricks] the gun. I looked at him, and I turned away."); J.A. 907 ("[Agent]: I mean, you gave [Ricks] the order, right? You gave him the nod, right? Archible: Yeah, I gave him the gun."). During the interview and during trial, Archible said that as a five-star member of the Bloods gang he could order lower ranked gang members, like Ricks who was a three-star member, to complete his

17

"dirty work," *see* J.A. 691 (Trial Tr. at 521: 17–25)[3], including having someone killed. When asked if he had ever ordered someone to get killed, Archible responded affirmatively. At trial, Archible also testified that he was buying guns at the time of Mr. Dudley's murder and owned the gun that Ricks carried to Mr. Dudley's house. This was the very gun that was ultimately was used to kill Mr. Dudley. J.A. 640–66.[4]

Therefore, with either the first or second version of events, it was undisputed that Archible instructed Ricks to get the gun that was used to kill Mr. Dudley, provided the firearm used to kill Mr. Dudley, broke into Mr. Dudley's home and was present at the scene where Mr. Dudley was killed, and orchestrated the events that ended in Mr. Dudley's death.

3.

---

[3] During the interview with Agent Ambrose, Archible was asked: "Like, you said as a Five-star, you could get somebody killed. Is that something that typically happens? I mean, have you done that? Have you called an order like that?" J.A. 882. Then, Archible responded with "Yeah." *Id.* Following his response, Agent Ambrose asked Archible, "You have? What was the - what - if you don't mind, what was the circumstances behind that?" *Id.* Then, Archible proceeded to tell the story of a "transaction that went bad," which was the story of how Mr. Dudley was killed. J.A. 882–95. Indeed, Archible said "I gave Dre the gun. I looked at him, and I turned away. Luke was standin' in the back of the room. Filled Luke ass up. Pop, pop, pop, pop, pop, pop." J.A. 895.

[4] We have upheld § 924(j) convictions in previous cases with similar facts. *See, e.g.*, *United States v. Bran*, 776 F.3d 276, 280 (4th Cir. 2015) (concluding there was substantial evidence to find that the defendant aided and abetted a § 924(j) offense where the defendant ordered prospective gang members to murder the victim and "provided them with a firearm to commit the murder"); *Foster*, 507 F.3d at 246 (concluding there was sufficient evidence that the defendant aided and abetted a § 924(j) offense where the defendant "had instructed [a codefendant] to kill [the victim] in order to prevent his testimony at [the defendant's] state trial" and the jury "heard extensive evidence that members of the conspiracy routinely used firearms to kill rival drug dealers"); *Williams*, 342 F.3d at 357 (concluding there was sufficient evidence that the defendant aided and abetted murder "since he was fully aware of [his coconspirator's] intent to kill [the victim] yet he continued to actively participate in the robbery").

18

The third version of events is that Ricks killed Mr. Dudley of his own volition without Archible's approval. Again, Archible admitted that after discovering that Mr. Dudley fooled them, Archible instructed Ricks to get a gun to make Mr. Dudley "pay." J.A. 901. Archible added, "If I would've seen him around 3-6, again tryin' to buy drugs. I would have got one of them lil youngens that's way younger . . . to fuck him up. Beat his ass." *Id.* Archible also admitted that the gun used to kill Mr. Dudley belonged to him. Archible testified that, after Mr. Dudley searched the room unsuccessfully, Archible took the gun from Ricks and directed Ricks to search the room. J.A. 895. After Ricks' search came back empty, Archible handed Ricks the gun, and then instructed Ricks to teach Mr. Dudley a lesson and turned away. Archible alleges that, though he gave Ricks the gun, gave Ricks a non-verbal cue instructing Ricks to deal with Mr. Dudley, and walked away, Ricks killed Mr. Dudley of his own volition and, as a result, Ricks might have received a disciplinary punishment for his action. J.A. 895–98. At trial, Archible maintained that he did not intend to rob or kill Mr. Dudley. J.A. 637–38. In all, Archible argues that none of the government's evidence directly linked Archible as the person who killed Mr. Dudley.

\* \* \*

Ultimately, the jury had three version of events on which to convict Archible for § 924(c)(1), (j) offense—two of which could be used to convict Archible of the offense. In this case, the jury decided to believe the government's witnesses over Archible's account of events. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) ("[W]here the evidence supports differing reasonable interpretations, the jury decides which interpretation to believe."). Again, we are "not entitled to assess witness credibility," and because the jury

19

found Archible guilty, we assume that the jury resolved any conflicting evidence in the prosecution's favor." *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018) (alteration and internal quotation marks omitted).  Though the jury could have believed Archible's version of events, it did not.  We have maintained that where "the evidence is capable of more than one interpretation and reasonable inferences therefrom can be drawn by a jury, its verdict should not be disturbed." *United States v. Dennis*, 19 F.4th 656, 668 (4th Cir. 2021) (internal quotation marks omitted).

IV.

For the foregoing reasons, the district court's judgment is

*AFFIRMED.*

20